# Hundley v. Collins *et al.*

### *Petition for Mandamus.*

1. *Mandamus; does not lie to restore a person to membership in church.*—The relations of a member to his church are not contractual, nor do they involve civil rights, but pertain only to spiritual affairs; and, therefore, courts of law are without jurisdiction, by *mandamus* or otherwise, to annul proceedings expelling a member from his church and to restore him to membership.

APPEAL from the Circuit Court of Madison.

Heard before the Hon. E. B. ALMON.

The appellant, Orville M. Hundley, filed his petition addressed to the judge of the Eighth Judicial Circuit, in which he averred that the "Christian Church of Huntsville, Alabama, was a corporation created and organized under the laws of Alabama in the year 1888;" that the petitioner was one of the original members who were associated together under the organization and incorporation of said church and has since continued a member thereof observing all its usages, keeping the faith and rules thereof; that at the organization of said church as a corporation, the petitioner, Ira W. Collins and R. H. McMullen, were elected trustees and were thereafter elected trustees of said church in December, 1894, and

that the petitioner, Ira F. Collins, R. A. McBride and Anthony W. Mosely were elected elders of such church; that the said Christian church is of a denomination of Christians known as "disciples of Christ" of which Alexander Campbell was originally preacher if not the founder; that each church was independent, not subject to the control of any higher or other ecclesiastical judicature; that the elders thereof are not elected for any definite time and can not be deposed otherwise than by a majority of the church to which they may belong after preferred charges of which they have notice and an opportunity to appear and answer; that on July 11, 1900, in the presence of such members of the church as were assembled, said Ira W. Collins, one of the elders of said church, produced and read a paper, signed by him and said R. A. McBride, as elders, "purporting to be and intended as an expulsion of your petitioner and his wife," and two other persons from membership in said church. This paper, read at said meeting, which was attached as an exhibit to the petition, commenced as follows: "Dear brethren and sisters: It becomes our solemn duty to obey the word of God in all things, and as much as in us lies." It then proceeded to state that as the petitioner, O. M. Hundley and his wife, and Oscar R. Hundley and A. W. Mosely had been guilty of disorderly conduct in a great degree by refusing to open the house of worship for services, "it rests upon us as those striving to do God's will to declare at this time our withdrawal of Christian fellowship from those guilty of such conduct." It then asked if there were any persons who knew of any scriptural reason why this action should not be taken, and if so it became their duty to let such reason be known, and then stated that there being no such reason given, "the church registrar is hereby ordered to cancel the names of said parties."

The petition then avers that neither the petitioner nor his wife, nor either of the other parties were present at said meeting of said church when the paper writing was produced and read by said Collins; nor did either have any notice or information of the existence of such paper; that no charges had ever been preferred against the petitioner; that there had been no general meeting

of the congregation to hear and try said charges; that said writing read by said Collins at said meeting was not submitted to the vote of such members of said church as were then asembled; and that no such vote was taken or offered to be taken.

The prayer of the petition was that "a writ of mandamus, directed to the said corporation, 'The Christian Church of Huntsville, Alabama,' and of date July 11, 1900, a copy of which marked 'M' is part of this petition, may be stricken from the file of the records or memorials of said church, if such files there be. And that any minute entry or other record of the proceedings on said paper writing, if such minute entry or record there be, may be expunged. And further commanding that your petitioner be restored to membership in said church, and to his relation as elder thereof and therein. And that such other order may be had in the premises as justice may require."

To this petition the respondents demurred upon several grounds, stating in various forms that civil courts could not entertain jurisdiction of the question presented by said petition, and said court in which the petition was filed was without jurisdiction to determine the validity of any action upon the part of this church with its membership. This demurrer was sustained and judgment was rendered decreeing that the petition be dismissed and the writ of mandamus be denied. From this judgment the petitioner appeals, and assigns the rendition thereof as error.

ROBERT C. BRICKELL and OSCAR R. HUNDLEY, for appellant.—In the consideration of the questions presented by the record in this case, the court should bear in mind that the respondent, Christian church, is a religious corporation organized under sections 1694 to 1699 of the Code of 1886, the statute then of force. We direct the attention of the court to the phraseology of section 1694, from which it plainly appears that only "members of the religious society" can become corporators, and upon incorporation the society and corporation become blended.

[Hundley v. Collins *et al.*]

This court has decided in no uncertain terms, that mandamus is the proper remedy to restore to membership a corporator improperly disfranchised, or irregularly removed from his connection with the corporation. *Medical Society v. Weatherly*, 75 Ala. 252.

This decision was reaffirmed in the same case in 76 Ala. 567, and is in line with the decisions of the courts in numerous other States.—Moses on Mandamus, 184 and 189; Angel and Ames on Corp., § 704; Thompson on Corp., §§ 904, 4398; High on Extr. Rem., §§ 291, 298; 14 Am. & Eng. Ency. Law (1st ed.), 153; *Otto v. Tailors' Union*, 7 Am. St. 156; *State v. Med. Society* (Ga.) 95 Am. Dec. 408; *Sibley v. Carteret Club*, 40 N. J. Law, 295; *Commonwealth ex rel. Fisher, v. German Society*, 15 Penn. St. 251; *Hiss v. Bartlett*, note 63 Am. Dec. 777; *Commonwealth v. St. Patrick's Society*, 4 Am. Dec., 453; *Smith Society v. Vandyke*, 30 Am. Dec., 263; *Green v. A. M. E. Society*, 1 S. & R. (Pa.) 254.

The only question of moment presented by the demurrer, is, that the civil courts have no jurisdiction to inquire into the matter presented by the petition, because the questions raised are ecclesiastical in their nature. It is neither asked nor desired, that the courts shall inquire into any ecclesiastical question. All that is asked is, that the court may judge of the cause of expulsion and the form of the proceedings, and enquire whether or not the expulsion and a motion was regularly had in accordance with the rules and regulations of the respondent Christian church.—*Medical Society v. Weatherly, supra; Long v. Harvey*, 177 Pa. St. 473. The courts of law have jurisdiction for this purpose, and the present case presents facts invoking such jurisdiction and justifying the relief prayed for. *Jones v. State*, 7 L. R. A. 325; *Gray v. Christian Society*, 50 Am. Rep. 312; *People v. Medical Society*, 32 N. Y. 187; *Delacy v. Nav. Co.*, 1 Hawks 274; s. c. 9 Am. Dec., 636; 20 Am. & Eng. Ency. Law (1st ed.), 789; *Commonwealth v. German Society*, 15 Penn. St. 251; *West Koshkonong Cong. v. Ottesen*, 49 N. W. Rep. (Wis.) 24; *State v. Chamber of Commerce*, 3 N. W. (Wis.) 712.

COOPER & FOSTER, *contra.*—A court of law is without jurisdiction to hear and determine the matters which are presented by the petition. The questions raised are purely of ecclesiastical cognizance, and determinable only by the proper ecclesiastical judicature. This contention has the support of the authorities.—*McNeil v. Bibb St. Church*, 84 Ala. 23; *Waller v. Howell*, 45 N. Y. Sup. 790; *Nance v. Busby*, 15 L. R. A. 801; *State ex rel. v. Hebrew Congregation*, 33 Am. Rep. 217; *Hardin v. Second Baptist Church*, 51 Mich. 137, s. c. 47 Am. Rep. 555; *Sale v. First Baptist Church*, 49 Am. Rep. 136; *Chase v. Cheney*, 11 Am. Rep. 95; *Dilcher v. German St. Stephens Church*, 53 N. Y. 103; *Connett v. Church of New Prospect*, 54 N. Y. 551; *Alexander v. Bouldin*, 15 Wallace 131; *Ex parte Humen*, 13 Peters 230; *Union Church v. Sanders,* 63 Am. Dec. 187; Cooleys Limitations, 571; *Shannon v. Frost*, 3 B. Mon. 253; *Ryan v. Cudahy*, 49 L. R. A. 353 and note on p. 354; High on Injunctions, §§ 308, 309, 310.

HARALSON, J.—1. The sections of the Code under which the "Christian Church of Huntsville" was incorporated, provide, "That members of any church or religious society  *   *   *  desiring to be incorporated, shall elect not less than three, nor more than nine trustees," § 1302 (1694); that "Such trustees shall, within thirty days after their election, file in the office of the judge of probate of the county in which the corporation is to exercise its functions, a certificate stating the corporate name selected, the names of the trustees, and the length of time for which they were elected, which certificate shall be subscribed by them and recorded. The members of such society, their associates and successors are, from the filing of such certificates, incorporated by the name therein specified."—Code, § 1303 (1695).

The succeeding section, 1304 (1696), provides, that corporations created under this article of the Code, may hold real and personal property, not exceeding in value $50,000, may receive property by gifts, will or devise, holding the same in conformity with all lawful condi-

tions imposed by the donor, and exercise such other powers as are incident to private corporations.

Sections 1305 (1697) provides, how suits may be commenced against such corporations, and section 1306 (1698), how mortgages on any part or all of the property of the corporation must be executed.

2. It is to be observed, that these provisions of the Code for the incorporation of churches or religious societies, and all powers conferred thereunder, relate alone to their properties or temporalities, and have no reference to the churches or societies as such, which bodies, as spiritual or ecclesiastical organizations, exist independent of their charters. A church or religious society may exist for all the purposes for which it was organized independently of any incorporation of the body under the statutes of the State; and, it is a matter of common knowledge that many do exist and are never incorporated. For the promotion of religion and charity, they may subserve all the purposes of their organization, and, generally, need no incorporation except incidentally to further these objects. They do not place themselves beyond the pale of the protection of the law as to properties, for the lack of incorporation. It is the province of a court of equity to protect such organizations in what they hold, in order to sustain trusts, because of their charitable uses, which would otherwise be held void.—*Williams v. Pearson*, 38 Ala. 299; *Burke v. Roper*, 79 Ala. 138; 20 Am. & Eng. Ency. Law (1st ed.), 804, 811.

Wherever there is an incorporated church, there are two entities, the one, the church as such, not owing its ecclesiastical or spiritual existence to the civil law, and the legal corporation, each separate though closely allied. The church in the ordinary acceptation of the word, is a voluntary association of its members, united together by covenant or agreement, for the purpose of maintaining the public worship of God, observing the ordinances of His house, the promotion of the spirituality of its membership, and the spread of divine truth among others, as they understand and teach it. It is purely voluntary, and is not a corporation nor a *quasi* corporation.—*Parker v. May*, 3 Cush. 345; 20 Am. &

Eng. Ency. Law, 775. On the other hand, a corporation is formed for the acquisition and taking care of the property of the church, and is in no sense ecclesiastical in its functions.

In *Sale v. The First Regular Bap. Church,* 62 Iowa, 26 (s. c. 49 Am. Rep. 136), the church was incorporated and the proceeding was by *mandamus* to reinstate a member expelled by the church. In drawing the distinction between the church and the corporation the court said: "The only and primary object of the corporation is the acquisition and taking care of property. The rules of the church as to the discipline of members have no relation to the corporate property or corporate matters. * * By virtue of her church membership, the plaintiff became a member of the corporation, organized for religious and ecclesiastical purposes. The corporation was not organized for pecuniary profit. No such profit can accrue to any member. No property interest, or any other valuable civil right, has been affected by the action of the church. The plaintiff has not, and cannot suffer any civil damages whatever. This view is in harmony with *Hardin v. Baptist Church,* 51 Mich. 137 (s. c. 47 Am. Rep. 555), where numerous authorities are cited." In this case it was held that *mandamus* would not lie to restore to membership one claiming to have been wrongfully removed from a church, notwithstanding that church membership was a condition of membership of the corporation. We refer in this connection to the case of *Ryan v. Cudahy,* 157 Ill. 108, as reported in the 49 Vol. of the Lawyer's Reports Annotated, 353, where will be found on page 384, under the head of "Ecclesiastical Tribunals," a synopsis of the decisions of a great number of courts on the subject in hand, sustaining the views we announce.

"The two bodies, viz.: the corporation and the church, although one may exist within the pale of the other, are in no respect correlative. The objects and interests of the one are moral and spiritual; the other deals with things purely temporal and material."—*Petty v. Tucker,* 21 N. Y. 267; *Nance v. Busby,* 91 Tenn. 303.

The foregoing is quite sufficient to show that the spiritual entity of a church, made up of members be-

[Hundley v. Collins *et al.*]

longing to it, existing without any special law to that effect, is a different and distinct body in the contemplation of law, from the same body when incorporated under statutes for the purpose—the two having different functions to perform, the one religious, and the other civil.

Under our statutes for the incorporation of churches, it is to be noted, that the *members* of the church become incorporated, and not simply the trustees required to be elected preparatory to proceeding in the court of probate to obtain incorporation. It was a proper, simpler and less troublesome proceeding, consulting the conveniences of the church, that certain designated members should be chosen to perform this service for and on behalf of all the members, rather than require all the members themselves to do so. The trustees having been elected, all they are required to do, to complete the incorporation under the statute is, within thirty days after their election, to file in the office of the judge of probate, the certificate required by section 1303 (1695) of the Code, and the members of the church, from the filing of such certificate, become incorporated by the name therein specified. Each member is an incorporator, recognized as a legal civil body distinct from the church as a spiritual body, theretofore and thereafter continuously existing.

In this case, it is alleged the petitioner was both a trustee and elder of the church. To be a trustee, the statute required him to be a member of the church; and it also appears that under the rules of the church, elders must be members. Trusteeship and eldership are then dependent upon membership in the church. It follows, if one is excluded from membership, his office of trustee or elder ceases by virtue of the act of exclusion. Each of these offices it appears is filled by the members of the church, acting as a church.

It is averred in the petition, that on the 11 July, 1900, at a meeting of such members of the church as were then assembled, such action was taken as was intended to be an exclusion of petitioner from said church. The petitioner treats the act as one of exclusion, since the prayer of the petition is, that he "be restored to mem-

bership in said church, and to his relation as elder
therein and thereof." It is not pretended, nor can it
be, that this act was done by the corporation, and not
by the church. The petition sets out a paper drawn and
presented as the foundation of the church's action. It
begins by an admonition addressed to the "Dear Breth-
ren and Sisters,"—an address of Christian endearment
usual among church people,—reminding them that it
is their solemn duty to obey the word of God, in that it
commands them to withdraw themselves from every
brother that walketh disorderly, proceeding to aver
wherein the petitioner and certain others had been guilty
of disorderly conduct; and ends by declaring it to be
their duty to withdraw Christian fellowship from peti-
tioner and others. No one can presume that such a
paper referred to the brethren and sisters of the church
in their corporate capacity; but by the language em-
ployed it must be supposed,—since it is not applicable
in any other connection,—that those addressed were the
members of the church sitting in conference, where the
spiritual well-being and concerns of the ecclesiastical,
spiritual body were to be considered and passed on.
There were no property interests involved, nothing touch-
ing what are termed the temporalities of the church as
contradistinguished from its spiritualities. The petition-
er had no pecuniary interests, in any direction, involved
in the proceeding, and it did not touch any of his civil
rights at any point. It may be, the church proceeded irre-
gularly according to common usage in such cases; but it
is averred, that this church "is of the denomination
known as 'Disciples of Christ,' of which Alexander
Campbell was the original preacher, if not the founder,"
and that "each church is of itself independent, not sub-
ject to the control of any higher or ecclesiastical judi-
cature." As an ecclesiastical body, therefore, it was a
law unto itself, self-governing and amenable to no
court, ecclesiastical or civil, in the discharge of its re-
ligious functions. It could make and unmake its rules
and regulations for the reception and exclusion of mem-
bers, and in reference to other matters; and what other
body religious or civil could question its right to do so?
Certainly, if it violated no civil law, the arm of civil

authority was short to reach it. Admitting, therefore, as we must on demurrer, that petitioner had no notice of this proceeding, and that it was irregular according to common usage, the church being independent, and not subject to higher powers, and being a law unto itself for its own procedure in religious matters, what it did towards the expulsion of petitioner was not unlawful, even if it was not politic and wise. If the civil courts may in this instance interfere to question the exclusion of petitioner, they may do so, in any instance where a member of that or any other church is removed, on the allegation of irregular and unfair proceedings for the purpose. This would open a door to untold evils in the administration of church affairs, not consistent with the principles of religious freedom as recognized in this country, where there is no established church or religion, where every man is entitled to hold and express with freedom his own religious views and convictions, and where the separation of State and Church is so deeply entrenched in our constitution and laws.

These views are in accord with the decisions of other States and of the Supreme Court of the United States.

In *Nance v. Busby*, 91 Tenn. 303, which is an exhaustive opinion on the subject, on review of many authorities, and directly applicable to the conditions of this case, it was said by the court, through Judge LURTON: "The relations of a member to his church are not contractual. No bond of contract, express or implied, connects him with his communion, or determines his rights. * * * The church undertakes to deal only with the spiritual side of man. It does not appeal to his purely human and temporal interests. Admission to its fold is prescribed alone by the church, professing to act only upon the word of God. It claims the power of the keys by divine and not human authority. Its right to determine the grounds of admission has never been questioned. Why shall the co-ordinate right of exclusion be scrutinized by the civil power? * * * Civil courts deal only with civil and property rights. If, to determine a property right, it becomes necessary to adjudicate an ecclesiastical question, the courts will go only so far as is necessary to determine the effect of

ecclesiastical law or relations on property rights. We are not to be understood as approving an expulsion from church membership by irregular methods and without notice to the member. But here we have a fact to deal with—the fact that this church, sitting' as a court, has determined for itself that it had the power and the right to exclude these complainants. They have as a judicature, adjudged that they had jurisdiction, and that the usage and law of the church did not demand other trial or notice than such as attended the public action of the church. The law of the church provides for no appeal to a higher tribunal. They may have erred in their procedure. It is not for a civil court to revise their action in a matter so vital to their freedom as a church. * * * We have been referred to no reported case where any civil court in this country has undertaken to overrule the fact of excommunication upon any ground whatever."

In *Shannon v. Frost,* 3 B. Monroe, 253, it was said: "This court, having no ecclasiastical jurisdiction, can not revise or question ordinary acts of church discipline or exclusion. Our only judicial power in the case arises from the conflicting claims of the parties to the property and the use of it. And these we must decide, as we do all other civil controversies brought to this tribunal for ultimate decision. We cannot decide who ought to be members of the church, nor whether the excommunicated have been justly or unjustly, regularly or irregularly cut off from the body of the church. We must take the fact of expulsion as conclusive proof that the persons expelled are not now members of the repudiating church; for whether right or wrong, the act of excommunication must, as to the fact of membership, be law to this court. * * * When they [the complainants] became members, they did so on the condition of continuing or not, as themselves and their church might determine. In that respect, they voluntarily subjected themselves to the ecclesiastical power, and cannot invoke the supervision or control of that jurisdiction by this or any other civil tribunal."

In the leading case of *Watson v. Jones,* 13 Wall. (U. S.) on this subject, where Justice MILLER reviews the

cases English and American, and maintains the doc-
trine of the non-interference by State courts over eccles-
iastical bodies in matters of religion, it is said: "The
law knows no heresy, and is committed to the support
of no dogma, the establishment of no sect. The right to
organize voluntary associations to assist in the expres-
sion and dissemination of any religious doctrine, and
to create tribunals for the decision of controverted ques-
tions of faith within the association, and for the eccles-
iastical government of all the individual members, con-
gregations and officers within the general association,
is unquestioned. All who unite themselves to such a
body do so with an implied consent to this government,
and are bound to submit to it. But it would be a vain
consent and would lead to the total subversion of such
religious bodies, if any one aggrieved by one of their
decisions could appeal to the secular courts and have
them reversed. It is of the essence of these religious
unions, and of their right to establish tribunals for the
decisions of questions arising among themselves, that
those decisions should be binding in all cases of eccles-
iastical cognizance, subject only to such appeal as the
organism itself provides for. * * * It is easy to
see that if the civil courts are to inquire into all these
matters (theological controversy, church discipline,
ecclesiastical government, or the conformity of the mem-
bers of the church to the standard of morals required of
them), the whole subject of the doctrinal theology, the
usages and customs, the written laws and fundamental
organization of every religious denomination may, and
must, be examined into with minuteness and care, for
they would become, in almost every case, the *criteria* by
which the validity of the ecclasiastical decree would be
determined in the civil court. This principle would de-
prive those bodies of the right of construing their own
church laws, and would open the way to all the evils
which we have depicted as attendant upon the doctrine
of Lord Eldon, and would, in effect, transfer to the civil
courts, when property rights were concerned the de-
cision of all ecclesiastical questions. * * * In this
class of cases we think the rule of action which should
govern the civil courts, founded in a broad and sound

view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that whenever the questions of discipline or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judiciatorics to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them."

In *McNeil v. B. St. Church*, 84 Ala. 23, this court said: "In accordance with the principles of our institutions, and the organic law, the courts refrain from interfering when the office or functions are purely ecclesiastical or spiritual, disconnected from any fixed emoluments, salary, or other temporalities. In such case, there is no legal, temporal right, of which the civil courts can take jurisdiction."

There can be no difference in the principles announced as argued by appellant's counsel, whether they are sought to be applied in a court of law or in courts of equity.

It is clear from what has been said, without reference to alleged defects in the petition for *mandamus*, making it, as contended, unavailable in this case, that there was no error in the ruling of the court below in denying the *mandamus*, sustaining the demurrer to the petition and dismissing it.

Affirmed.