# Harris, *et al. v.* Cosby, *et al.*

### *Bill to Determine the Right to Certain Church Property.*

(Decided Feb. 2, 1911.   Re-hearing denied Apr. 27, 1911. 55 South. 231.)

1. *Religious Societies; Presbyterian Church; General Assembly; Authority; Constitution.*—Under the constitution of the Cumberland Presbyterian Church, with the consent of the majority of the Presbyteries, the General Assembly of said church could abolish itself and create another supreme judicial legislative body, and hence had constitutional power to carry out a desire to unite the Cumberland Presbyterian Church with the Presbyterian Church of the

[Harris, et al. v. Cosby, et al.]

United States of America, and to so modify the church creed and government as to make such union possible.

2. *Same; Church Government; Right of Majority.*—Where property is held by a religious congregation which, by virtue of its organization, is strictly independent of other ecclesiastical associations, and, so far as church government is concerned, owes no fealty to higher authority, and its principles of government is that the majority rule, then the majority of the members are entitled to control the property.

3. *Same; Church; Courts; Decisions; Conclusiveness.*—Where an ecclesiastical body or congregation holding property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control in some supreme judiciary over the whole membership, the determination of questions of ecclesiastical rule, discipline or faith, by the highest of such judiciatories, will be regarded as binding on the civil courts.

4. *Same; Church Adjudicatories; Jurisdiction; Union with Other Churches.*—Under the constitution of the Cumberland Presbyterian Church the general assembly, with the consent of the Presbyteries, had full power to conduct proceedings for union with the Presbyterian Church of America, such general assembly being the highest judicatory in that church, and it also had power to determine that the proceedings to carry out the desired union had been legally and constitutionally conducted, and that the union had been effectuated, notwithstanding the constitution of the church, since it must be regarded as a grant rather than a limitation of power.

5. *Same; Civil Rights; Doctrine.*—Where a civil right depends upon an ecclesiastical matter, its determination is for the civil, and not for the ecclesiastical courts though the civil court try only the civil rights, taking the ecclesiastical decisions out of which the right arises as it finds it.

6. *Charities; Religious Doctrine; Judicial Determination.*—Where property is devoted to the teaching of some specific form of religious doctrine by the express terms of the deed or will, the courts, as in all cases, of special trust, will take jurisdiction to see that the property is not diverted from the special purpose for which it has been conveyed.

APPEAL from Birmingham City Court.

Heard before Hon. H. A. SHARPE.

Bill by P. H. Harris and others as trustees and members of the First Cumberland Presbyterian Church of Birmingham against W. M. Cosby and others to determine the right to possession to certain church property. Decree for respondents, and complainants appeal. Affirmed.

[Harris, et al. v. Cosby, et al.]

NATHAN L. MILLER, H. C. SELHEIMER, CARMICHEL & WYNN, W. C. CALDWELL and W. V. LAMB, for appellant. There was *no power* in the General Assembly acting alone, nor in the General Assembly with the aid of an affirmative answer from a majority of the Presbyteries to the question submitted to the Presbyteries, to effectuate the union attempted to be consummated between the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church, and the action taken therein is contrary to the constitution, without authority *ultra vires* and void.—*Broyles v. Roberts,* 222 Mo. 613, 121 S. W. 805; *Landrith v. Hudgins,* 120 S. W. 783; *Clark et al. v. Brown,* 108 S. W. 421; *General Assembly of the Free Church of Scotland v. Lord Overton et al.;* 20 The Times Law Reports, 730; *Medical and Surgical Society v. Weatherly,* 76 Ala. 567; *Sullivan v. L. & N. R. R. Co.,* 138 Ala. 650, 662; 2 Page on Contracts, Secs. 1123, 1130; *Robins v. Clark,* 127 U. S. 622; *L. & N. R. R. Co. v. Shepard,* 126 Ala. 416, 422; *Bullock Co. v. Coleman,* 136 Ala. 610, 615. Webster's Int. Dictionary, "Limited" and "By" Standard Dictionary, "Limited" and "By." 5 Words & Phrases, pp. 4167, 4164; 25 Cyc. 960; 6 Cyc. 262; *First Cumberland Pres. Ch. v. Keith;* 2 Page on Contracts, Sec. 1126, pp. 1751, 1752; *Gadsden & A. N. Railway Company v. G. L. & Imp. Company,* 128 Ala. 510; *The Phaa. W. & B. R. R. Co. v. Trimble, et al.,* 77 U. S. 367; *Abercrombie & W. v. Vandiver,* 126 Ala. 513, 534; *Cincinnati v. Coke Company,* 41 N. E. 234. There is no power conferred upon the General Assembly and Presbyteries to form a new Christian denomination out of the Cumberland Presbyterian Church and another denomination of Christians or in such manner to form another body of any character or to merge the Cumberland Presbyterian Church into another denomination. The proceedings had

by which the alleged union was sought to be effectuated did not constitute an amendment to the Constitution of the Cumberland Presbyterian Church.—*Broyles v. Roberts*, 121 S. W. 805; *Clark v. Brown*, 108 S. W. 421; *Collier v. Frierson*, 24 Ala. 100; *State of Miss. ex rel. v. Powell*, 48 L. R. A. 652; 8 Cyc. 719; *Ex parte Cowart*, 98 Ala. 94, 99, 100. Such power as was vested in the General Assembly and Presbyteries to amend the Constitution was not exercised in the mode and manner prescribed by the Constitution, as regards any of the proceedings had relating to the alleged union, and considered as an amendment said proceedings are void and of no effect.—Authorities, supra; *Landrith v. Hudgings*, 120 S. W. 783. The joint report on union and reunion made to and adopted by the respective General Assemblies contemplated that only a part of the plan of union should be submitted to the Presbyteries for their approval or disapproval, or acted upon by them.— Authorities supra. The alleged "Reunion and Union" if any such has been consummated, *is a merger* of the Cumberland Presbyterian Church into the then already existing *Presbyterian Church in the United States of America*, and not an union with another organization creating a new ecclesiastical organization or denomination having its origin in such union.—*Broyles v. Roberts*, 121 S. W. 805; *Clark v. Brown*, 108 S. W. 421; *Landrith v. Hudgins*, 120 S. W. 783; *First Cum. Pres. Chrch v. Keith*, opinion by Bullock Chancellor. "Civil Courts are presumed to know all the law touching property rights, and if questions of ecclesiastical law connected with property rights come before them, they are compelled to decide them. They have no power to abdicate their own jurisdiction and transfer it to other tribunals." The decrees and judgments of ecclesiastical courts are not final and conclusive upon the Civil

courts, in the determination by the civil courts, of property rights.—*Broyles v. Roberts,* 121 S. W. 805; *Houston v. Howe,* 162 Ala. 500, 503; *State ex rel. McNeil v. Bibb Street Church,* 84 Ala. 23; *Christian Church v. Sommers,* 149 Ala. 145, 18, 19; *Brundage v. Deardorff,* 55 Fed. 839; *Hundley v. Collins,* 131 Ala. 234; *R. R. Coms. of Ala. v. Central of Ga. R. R. Co.,* 170 Fed. 225, 237; *Clarke v. Brown,* 108 S. W. 421; *Landrith v. Hudgins,* 120 S. W. 783; *First Cumberland Pres. Church v. Keith,* opinion by Bullock, Chancellor. *The title to Church property of a divided congregation* is in that part of it which adheres to the original organization and is acting in harmony with its own laws and the ecclesiastical customs, usages and principles which were accepted among them before the dispute arose.—*McAuley's Appeal,* 77 Pa. 397; *Broyles v. Roberts,* 121 S. W. 805, 813. The property in question is charged with a specific trust and devoted to the maintenance of the Cumberland Presbyterian Church as such church existed in September, 1872, and the present application of it to the maintenance of a Presbyterian Church of the United States of America, is a diversion of said trust.—*Landrith v. Hudgins,* 120 S. W. 783. A party holding property in trust and diverting it from the use charged upon it may be directed to deliver same to complainants and pay damages for detention.—*Elec. L. Co. v. Rust,* 131 Ala. 484, 491, 492.

JOHN M. GAUT, SAM'L D. WEAKLEY, and JOE C. HALE, for appellee. The union has been upheld by the Supreme Court of Georgia, Kentucky, Texas, California, Illinois, Indiana and Arkansas.—*Ramsey v. Hicks,* 91 N. E. 344; *First Presbyterian Church v. First Cumberland Church,* 91 N. E. 761; *Sanders v. Baggerly,* 131 S. W. 48; *Watson v. Jones,* 13 Wall. 679; *Hundley v.*

*Collins,* 131 Ala. 234. Under these authorities it is contended that the union was properly brought about and that the decree of the lower court should be in all things affirmed.

SIMPSON, J.—This is a bill in equity filed by the appellants as trustees and members of the First Cumberland Presbyterian Church of Birmingham against the appellees, who are claimed by the bill to have abandoned the Cumberland Presbyterian Church, and become members of the Presbyterian Church, U. S. A.

The matter involved is certain property in Birmingham, Ala., which originally belonged to the Cumberland Presbyterian Church, and is claimed by the respondents as representatives of the Presbyterian Church, U. S. A. by virtue of a union effected by that church with the Cumberland Presbyterian Church, while the complainants claim that said union was never legally consummated, and that they, representing the Cumberland Presbyterian Church, are entitled to the property, and that the respondents should be enjoined, etc. So the question to be decided is whether or not the Cumberland Presbyterian Church has been united with the Presbyterian Church, U. S. A., under the name of the latter.

The Presbyterian Church, U. S. A., is a denomination of Christians holding as their doctrinal system the Confession of Faith, Catechisms, and form of government which were formulated by that famous assembly of learned men of the time called by the English Parliament to meet in Westminster Abbey, in London, in 1643, hence called the Westminster Assembly, which labored for 5½ years, and, besides the doctrinal standards, claimed to be based directly on the Holy Scriptures, also presented a form of government, republican

in form, as distinguished from monarchial or hierarchical, on the one hand, and from the strictly democratic, or congregational form, on the other, in which the people of each congregation vote directly on all matters pertaining to the church. Under this system the people vote on nothing save the matters pertaining to the congregation, the election of the pastor, and of church officers and trustees. The Session, composed of the pastor and ruling elders, is the ruling body of the church. The Session elects delegates to the Presbytery and Synod; each pastor being ex officio a member of each. The Presbytery elects delegates, called "commissioners," to the General Assembly. These are called "Judicatories," but they possess not only judicial, but legislative, powers, and the General Assembly is the supreme judicatory of last resort. We will allude more in detail to its powers later on, for the form of government of the Cumberland Presbyterian Church is the same as that of the Presbyterian Church, U. S. A.

In the year 1810, there being differences of opinion among the members of said church in regard to the interpretation of certain of the standards of faith in their confession, three ministers withdrew from said church, and organized an independent Presbytery called the "Cumberland Presbytery." They claimed that a proper interpretation of certain articles in said Confession of Faith amounted to fatalism, while the Presbyterian Church, U. S. A., claimed that such was not their meaning. They also claimed that a certain other article indicated that some infants are lost eternally, while the other contended that it meant nothing of the kind, and that it was only an explanation of how infants are saved. The Cumberlands also thought that the requirements for the education of the ministry were too strict. Thus it will be seen that one party simply interpreted

their standards one way and the other another, and the lay mind, in contemplating the long contention over, and final adjustment of these abstruse theological questions, is reminded of the fabled battle between the two knights as to whether the shield was brass or copper, who, when they saw both sides, found it brass on one side and copper on the other.  However, on the 4th day of February, 1810, the Cumberland Presbytery was organized by three ministers who state that they are regularly ordained ministers of the Presbyterian Church, that they have waited four years for a redress of their grievances, and a restoration of their rights.  They then proceed to define the qualifications of candidates for the ministry thereafter, to wit, "that they shall be required to receive and adopt the Confession and Discipline of the Presbyterian Church, except the idea of fatality, which seems to be taught under the mysterious doctrine of predestination.  It is to be understood, however, that such as can clearly receive the Confession without an exception shall not be required to make any."  They then provide for the qualifications of the ministry (educationally).  The Presbytery subsequently adopted "a circular letter," addressed "to the Societies and Brethren of the Presbyterian Church," etc., stating their differences, and stating that "the exception or condition in which they were indulged was only designed to meet some conscientious scruples, in points not fundamental or essential, particularly the idea of fatality, that seemed to some of them to be there taught, under the high and mysterious doctrine of predestination."  They also state in said circular "that we have it in view as a Presbytery to continue or make another proposition to the Synod of Kentucky or some other Synod for a reunion.  If we can obtain it without violating our natural and scriptural rights, it will meet the most ardent wish of our hearts."

Afterwards a Synod was formed, followed by others, and a General Assembly. The Confession of Faith was revised, and in reporting it to the General Assembly in 1882 the committee state: "We have not changed a single doctrine fundamental to your scheme of theology, or any of its correlates," and that no material changes were made in the government of the church "except such as were found necessary to present more clearly the practice and usage of the church courts and such as were deemed proper to develop more certainly our work and resources," and that "in the constitution, which takes the place of what is now termed 'form of government,' are included only those fundamental principles, which, with the Rules of Discipline, are not to be changed without the approval of the Presbyteries," while the General Assembly alone is allowed to make changes in general regulations, not fundamental in character, "Directory of Worship and Rules of Order."

The General Assembly in adopting this report provides "that those who have heretofore received and adopted the Confession of Faith approved by the General Assembly in 1829, and who prefer to adhere to the doctrinal statements contained therein, are at liberty to do so." This matter was submitted to the Presbyteries for their vote on the same. In 1811 committees were appointed by the Cumberland Presbytery to confer with similar committees of the Presbyteries of Muhlenburg and West Tennessee (Presbyterian) on the subject of reunion, and in 1812 the Cumberland Presbytery unanimously adopted resolutions referring to the failure of said committees to agree, in one of which it is resolved "that this Presbytery have always been, and expect always to be, ready and willing for union with the general Presbyterian Church, on gospel principles."

Without entering into a tedious detail, the records of the Cumberland Presbyterian Church show that committees were appointed at different times to confer with similar committees of the Presbyterian Church, U. S., the Presbyterian Church, U. S. A., and the Evangelical Lutheran Church, in all of which their general agreement in doctrine and government was emphasized, and their differences were stated to be not fundamental, and the union was stated to be desirable.

This history shows that it has been one of the cardinal principles of the Cumberland Presbyterian Church since the organization of the first Presbytery that a union with the original church and other members of the Presbyterian family was desirable and would be effected, whenever, by mutual concession in the statement of their creeds, the Cumberland Church could go into the union without a sacrifice of principle. This history shows another fact important to the decision of this case, to wit, that the entire government of the church is committed to the church courts so called, which have both judicial and legislative power and authority, and that the individual members of the congregations are not called upon to vote, save to elect their elders; that the elders compose the Church Sessions, which elect members to the Presbyteries, and the Presbyteries elect members (called commissioners) to the General Assembly; and that the action of the General Assembly, confirmed by the vote of the majority of the Presbyteries, is the supreme law of the church. It will be noted that the first Presbytery was organized by three ministers alone, that subsequently the Synods and General Assembly were organized by the Presbyteries, and the Confession of Faith and constitution were adopted by the General Assembly, and its action confirmed by the Presbyteries, and there is no intimation that the people ever voted on any of these matters.

We will not unduly lengthen this opinion by discussing the successive steps by which the union was consummated. The Supreme Courts of Arkansas and California have summarized them very clearly, and shown that, although a short form of ballot was used, yet the entire plan of union was fairly and properly submitted to the Presbyteries.—*Sanders v. Baggerly* (Ark.) 131 S. W. 58, cols. 1, 2; *Permanent Com. of Missions (C. P. Ch.) v. Pacific Synod (Pres. Ch., U. S. A.)* 157 Cal. 105, 106 Pac. 395, 401.

According to the constitution of the Cumberland Presbyterian Church, the jurisdiction and powers of the various church courts are defined, and by it the General Assembly is the supreme judicial, and also the supreme legislative body. In its legislative capacity it is limited only by section 60 of said constitution, which provides that "upon the recommendation of the General Assembly, at a stated meeting, by a two-thirds vote of the members thereof voting thereon, the Confession of Faith, Catechism, Constitution, and Rules of Discipline, may be amended or changed, when a majority of the Presbyteries, upon the same being transmitted for their action, shall approve thereof," and then provides that other changes may be made by the General Assembly alone. Section 40 provides that "the General Assembly is the highest court of this church, and represents in one body all the particular churches thereof, *   *   *   and constitutes the bond of union, peace, correspondence, and mutual confidence among all its churches and courts." If the General Assembly, with the concurrence of the Presbyteries, could adopt the Confession of Faith and the constitution, it would seem to necessarily follow that they could amend or change it. It cannot be doubted that, under this constitution, the General Assembly, with the concurrence of the

Presbyteries, could abolish the General Assembly and create another supreme judicial and legislative body, and certainly could carry out the expressed desire of the church from its inception to reunite it with the church from which it so reluctantly separated by the satisfactory adjustment of differences which it has repeatedly said were not fundamental.

The entire history of the Presbyterian family of churches is a history of divisions, separations, and reunions always effected by the action of the representa· tive bodies, and not by the body of the people directly. In fact, it seems to be admitted, and it is true, that all church as well as other organizations have the inherent power to unite with other similar organizations; the only question being whether that power resides in official authorities, or in the people, by majority or by the consent of every individual. We think we have shown that the supreme power is by the constitution of this church lodged in the General Assembly with a concurrence of the Presbyteries. But, as the church has created a supreme judicial tribunal, it is important to decide whether it has passed on this matter and what is its binding force on the decision of this court. If the General Assembly with the concurrence of a majority of the Presbyteries had the power to change the consti· tution and effect the union, it necessarily follows that, unless there is some constitutional restriction, they must determine the terms of the union, and whether there has come about such an agreement in doctrine as to justify the union. But to the point as to whether the General Assembly in its judicial capacity has passed upon the legality of the union. It is insisted that it is incongruous for the same body to decide judicially that its legislative acts are constitutional. It may be that, when the Constitution of the United States was (as

claimed) modeled on the form of government of the Presbyterian Church, it was a wise provision which differentiated the two by separating entirely the executive, judicial, and legislative branches of the government; yet the fact remains that, according to the constitution of this church, they are not so separated, but, on the contrary, the judicial and legislative departments are united in one body. That being the case, it follows that the supreme judicial body must pass upon the constitutionality of its own acts in connection with that of the Presbyteries required to concur with it. Did it do this?

In its legislative capacity it passed the resolutions adopting the report of the committee, which, in connection with a similar committee of the Presbyterian Church, U. S. A., had formulated the plan for a union of the two churches, and sent the matter down to the Presbyteries for their action on the same. The reports from the Presbyteries came in. The committee appointed for that purpose, by a majority report, reported that a majority of the Presbyteries had voted in favor of the plan of union, and presented a resolution "that this General Assembly does hereby find and declare that a constitutional majority of the Presbyteries of the Cumberland Presbyterian Church have voted approval of the reunion and union of said churches upon the basis set forth in said joint report, and does find and declare that said reunion and union has been constitutionally agreed to by the Cumberland Presbyterian Church, and that said basis of union has, for the purposes of the union, been constitutionally adopted."

There was a minority report, stating, among other things, "(1) that there is no power given the General Assembly, by the constitution of the Cumberland Presbyterian Church, to negotiate, enter into, or confirm

such union as is proposed, and was submitted by the Moderator and Clerk of our Assembly; (2) that such action is contrary to, and in violation of, the provision and spirit of the constitution of the Cumberland Presbyterian Church, and such action is without authority and void." It will thus be seen that the legality and constitutionality of the adoption of the plan of union was distinctly presented to this supreme judicature, and it adopted the majority report, thus deciding the question in favor of the regularity and constitutionality of the adoption of the plan of union. In the case of *Watson v. Jones,* 13 Wall. 679, 20 L. Ed. 666, there having been a schism in the church, it was a question as to which of two sets of officers represented the Walnut Street Church.

The court classifies the questions which have come before the courts in regard to rights of property held by ecclesiastical bodies into three, to wit, first, when the property, by the express terms of the deed or will, is devoted to the teaching of some specific form of religious doctrine; second, when the property is held by a religious congregation which, by the virtue of its organization, is strictly independent of other ecclesiastical associations, and, so far as church government is concerned, owes no fealty or obligation to any higher authority; and, third, where the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization, in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judiciary over the whole membership of that general organization.

The court recognizes that in the first class the court will, as in all special trusts, see that the property is not diverted from the special purpose for which it has been conveyed.

[Harris, et al. v. Cosby, et al.]

In the second class, if the principle of government be that the majority rules, then the majority of the members have the right to control the property.

In the third class (which applies to the case now under consideration), to wit, "property acquired in any of the usual modes for the general use of a religious congregation which is itself a part of a large and general organization of some religious denomination, with which it is more or less intimately connected by religious views and ecclesiastical government," the court is "bound to look at the fact that the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments," and, after referring to the Presbyterian system of the church session, the Presbytery, the Synod, and the General Assembly, over all, the court says: "In this class of cases we think the rule of action which should govern the civil courts, founded on a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority, is that, whenever the question of discipline or of faith or ecclesiastical rule, custom, or law has been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." It is conceded by the court that the doctrine of the English courts is otherwise, but in this country, where there is no union of church and state, where the laws know no heresy, and churches are not voluntary religious organizations, with the same right that other voluntary associations have to adopt their own form of government, "and to create tribunals for the decision of controverted questions," "all who

unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it."

Quoting from the case of *Harmon v. Dreher,* Speer's Eq. (S. C.) 87, reaffirmed in the *Johns Island Church Case,* 2 Rich. Eq. (S. C.) 215, the court says: "When a civil right depends upon an ecclesiastical matter, it is the civil court, and not the ecclesiastical court, which is to decide. But the civil tribunal tries the civil right, and no more, taking the ecclesiastical decisions out of which the civil right arises as it finds them." We hold this to be a clear statement of sound law, but we do not accept the intimation in the following portion of the opinion (though it is not directly said) that the matters of ecclesiastical law are so metaphysical and abstruse that the civil court will not inquire into the jurisdiction of the ecclesiastical court. Upon principle its decisions must stand upon the basis of any other court or tribunal having the right and power to pass upon any matter; and, however difficult it may be, the civil court must ascertain whether or not it had jurisdiction, and according to the decisions of our own courts, when it is charged with the ascertainment of the jurisdictional facts, its ascertainment is final.

This is in accordance with the decisions of the Supreme Court of the United States and of our own court. —*Rose v. Himely,* 4 Cranch, 241, 269, 2 L. Ed. 608; *Wilcox v. Jackson,* 13 Pet. 498, 511, 10 L. Ed. 264; *Hickey's Lessee v. Stewart,* 3 How. 750, 762, 11 L. Ed. 814; *Elliott v. Piersol,* 1 Pet. 328, 340, 7 L. Ed. 164; *Thompson v. Whitman,* 18 Wall. 457, 466, 21 L. Ed. 897; *In re Sawyer,* 124 U. S. 200, 220, 8 Sup. Ct. 482, 31 L. Ed. 402; *Ex parte Terry,* 128 U. S. 289, 305, 9 Sup. Ct. 77, 32 L. Ed. 405; *Kingsbury v. Yniestra,* 59 Ala. 320; *Hunt & Condry v. Mayfield,* 2 Stew. 124; *Kohn, Leiberman & Co. v. Haas,* 95 Ala. 478, 12 South. 577.

[Harris, et al. v. Cosby, et al.]

From what has been said and quoted in regard to the constitution of the Cumberland Presbyterian Church, even though it be admitted that said constitution is a grant of power, like the Constitution of the United States, and not a limitation of power, as our state Constitutions are, according to the great leading decision of *Dorman v. State,* 34 Ala. 216, we hold that this jurisdiction is distinctly conferred by the constitution of the Cumberland Presbyterian Church, and consequently the decision of that high tribunal must control the decision of this court, to the effect that the union of the two churches has been legally and constitutionally effected.

It is insisted by the appellants that "the first and great principle of the duties of a society—nation, state or church—towards itself, as a society distinguished from its government, is self-preservation." It is true that Vattel states the general principle that a nation in carrying out its obligation to promote the general welfare "is obliged to perform the duty of self-preservation," but the learned author goes on to remark that "it is therefore not absolute, but conditional; that is to say, it supposes a human act, to wit, the social compact, and as compacts may be dissolved by the common consent of the parties—if the individuals that compose the nation should unanimously agree to break the link that binds them, it will be lawful for them to do so, and thus destroy the state or the nation."—Law of Nations, c. 2, § 16.

Other quotations are made from various writers, to the effect that a state or nation which existed before the adoption of its constitution remains a state or nation through successive changes in its constitution. Among others Wheaton is quoted, as saying that "such a body or society, when once organized as a state, by an

established government, must remain so until it is destroyed. This may be done by disintegration of its parts, by its absorption into and identification with some other state or nation, or by the absolute and total dissolution of the ties which bind the society together. We know of no other way in which it can cease to be a state."

Even as to a state, if it has the power by the vote of its people to break the link that binds the people together, to disintegrate its parts and to be absorbed into, or identified with some other state, it follows that, if the only bond of union is a written constitution which prescribes how it may be changed, then, when that constitution is changed in the manner prescribed, the powers that made that constitution have consented to that change, whether it be merely to place it under a different legislative body, to identify it with some other organization, or to disintegrate its parts. In fact, the substance of all these utterances is that only the power which creates can destroy. Judge Cooley, also, is quoted as saying that "a written constitution is in every instance a limitation upon the powers of government in the hands of its agents; for there never was a written republican constitution which delegated to functionaries all the latent powers which lie dormant in every nation, and are boundless in extent and incapable of definition."—Cooley, Const. Lim. (7th Ed.) p. 69. This expression is preceded by the statement that the constitution is not the beginning of a community, nor the origin of private rights, that it presupposes organized society, law, order, etc. Evidently the learned author is not referring to changes in government, or to the substitution of one supreme authority for another, but to personal freedom, political freedom, etc., which he holds to be inalienable.

It is true, also, as stated by Judge Cooley, that a mere legislative body cannot delegate its authority, but that has no application to the abolition of one legislative body and the setting up of another by a change in the constitution. Motley, in his great History of the Rise of the Dutch Republic, says: "The signers of the declaration of independence acted in the name and by the authority of the Netherland people. The estates were in the constitutional representatives of that people," and, the king's sovereignty having been forfeited, "inquiring what had become of the sovereignty, they found it not in the mass of the people, but in the representative body, which actually personated the people."—Volume 3, p. 515. Such changes and unions of states are not unknown in the history of governments. Scotland was an independent kingdom, and yet, by the action of her Parliament, and without any. vote of the people, she ceased to be an independent kingdom and became a part of the kingdom of Great Britain, her Parliaments ceased to meet, and she is simply represented in the British Parliament as England is. The same is true of Ireland. It matters not that the Scottish King James VI became King James I of England. Scotland maintained an independent kingdom, afterwards had its own king (James VII), and the union was effected in the reign of Queen Anne by concurrent acts of the Scottish Parliament and that of England. It is true that this was not a republic, but it was the act of a representative body, uniting Scotland with England, under the British crown, which, according to the theory contended for, could not be done without the consent of every citizen. Texas was an independent republic, yet it surrendered its independence, and became one of the family of states under the Constitution of the United States. The treaties and negotiations for annexation

were carried on by the Texas Congress and governmental officials with those of the United States, and while, as under their Constitution the Congress did not have the power to change their Constitution, the matter was referred, for ratification, to a convention, which was to change the Constitution so as to harmonize it with the new relations about to be assumed, yet that convention was a representative body, and, if the powers conferred upon it had been originally conferred on Congress, it cannot be doubted that it could have completed the annexation without a reference to the convention. This illustration at least shows that it is not correct to say that a republic cannot efface itself and enter into a union with another power without the consent of every individual in it. The quotation from the case of *McCulloch v. State of Maryland*, 4 Wheat. 404, 4 L. Ed. 579, to the effect that "the powers delegated to state sovereignties were to be exercised by themselves, and that while they were competent to enter into the confederacy, by mere legislative action, yet when the 'more perfect union' came to be formed it was referred to the conventions called for that purpose," was merely the basis of an argument that the people who had conferred the powers of sovereignty on their state Legislatures could withdraw a portion of that sovereignty and confer it on the United States government. So in this case the Assembly, with the concurrence of the Presbyteries which had adopted the Constitution, could change it, so as to place at the head of the sovereign power another General Assembly, thus effecting the union. But it is not necessary to pursue this point further. While it is true that the government of this church is republican in form, yet it is not a state or nation, but merely a voluntary religious association, or, in other words, a voluntary corporation. Its constitution was adopted in

the same way that this plan of union was adopted, and all members who have come into it entered it subject to the fundamental law of its organization. The change made in its constitution did not disintegrate its churches or its Presbyteries, but simply substituted for its General Assembly the General Assembly of the re-united church, and, as shown, this was within the powers conferred, and was accomplished in the way provided by its constitution, and the only way, according to its constitution, by which the church, as a body, could act. It is not only not unusual, but it is in accordance with the law and practice of corporations generally, for, as a general rule, so far from being indestructible, the charters of corporations and statutes for their organization provide how they may be dissolved, and how united with other corporations, and, whenever the course prescribed is pursued, the union is accomplished or the corporation dissolved and ceases to exist.

The decree of the court is affirmed.

Affirmed.

DOWDELL, C. J., and MAYFIELD, and SAYRE, JJ., concur. MCCLELLAN, J., not sitting.