Dennis Putman is a Catholic priest and Joseph G. Vath is the Bishop of the Catholic Diocese of Birmingham. Putman was incardinated in the Diocese of Birmingham and was serving at the direction of the Bishop as Campus Minister at the University of Alabama in Birmingham on December 7, 1973, when Bishop Vath assigned him to serve as Notary of the Tribunal of the Diocese and as Assistant at the Church of Our Lady of Sorrows. On December 11, 1973, Putman replied to the Bishop saying that he would consider the assignment and whether to accept it by January 16, 1974. The Bishop again, on December 13, repeated his notice that Putman was to assume the new assignment on December 15. Putman did not assume the new assignments; and on December 19, Bishop Vath informed him that he was suspended from all exercises of his priestly ministry and all of his faculties were revoked. He also directed the priest to vacate the Diocesan Rectory where he had been living. Putman refused to do so.
Thereafter, on February 5, 1974, Bishop Vath and Putman executed a document whereby Putman would vacate immediately the Diocesan Rectory where he had been living at the pleasure of the Bishop, and the Bishop would ". . . arrange for the proper canonical tribunal to be established in the Diocese of Mobile or in such other diocese as will be willing and able to accom[m]odate, in an equitable manner, such *Page 27 
proceeding as may be filed by Father Putman. . . ."
Immediately thereafter, Bishop Vath contacted Archbishop Donnellan of the Diocese of Atlanta requesting permission to institute a tribunal in Atlanta to hear Putman's grievance on the assignment which his Bishop had given him. Archbishop Donnellan replied that he would be pleased to institute a tribunal, but that it would be necessary for him to have a delegation from the proper authority to do so. Bishop Vath, in response to Archbishop Donnellan's request, wrote Archbishop Jadot, the Apostolic Delegate in Washington, D.C., seeking permission to delegate Archbishop Donnellan to institute a tribunal to hear Putman's grievances. In March, 1974, the Apostolic Delegate advised Bishop Vath that his request would have to be forwarded to the Vatican for a ruling and that that was being done. In May, the Apostolic Delegate informed Bishop Vath that the Vatican had determined that the Putman matter was an administrative, and not a judicial, one; and, therefore, under the Canonical Law of the Roman Catholic Church, no tribunal could be established. This information was passed on to Father Putman by the Bishop, who informed him that he had a right of appeal, afforded by the Canonical Law of the Church.
Father Putman exercised that right of appeal and submitted his grievance to Cardinal John Wright, Prefect for the Sacred Congregation for the Clergy, in Rome. Subsequently, Cardinal Wright reported to Father Putman the decision of the Sacred Congregation, which was in part:
 ". . . It seems evident that Fr. Putman is in no way willing to obey and to cooperate reasonably with the specific desires of his Bishop, who is responsible for the direction and guidance of the Church in Birmingham, Alabama. It is because the evidence points to a real unwillingness on the part of Fr. Putman to accept the reasonably expressed authority of the Church that his appeal for reinstatement as Campus Minister and against suspension cannot be upheld.
 "Therefore, Fr. Putman should be offered the following alternatives: 1) accept the new appointment offered by the Bishop and the conditions attached to them. Or 2) while being relieved of diocesan duties, be given every assistance in reviewing his priestly life in accordance with the mind of the Church today."
Bishop Vath thereafter wrote to Putman inviting his response to the alternatives offered by the Sacred Congregation to which he had presented his appeal. Putman declined to accept either alternative and thereafter filed this lawsuit, which sought $10,000 in damages and asked for a declaratory judgment that Bishop Vath not deprive him of a benefice, office or salary sufficient for his proper support, and not suspend him from his priestly duties ". . unless and until the Defendant shall have convened a canonical tribunal in the Diocese of Mobile to hear the complaint of Plaintiff."
Bishop Vath challenged the court's jurisdiction to entertain the lawsuit, contending that the entire matter was one governed by Canon law and not by the civil courts. He also moved for summary judgment, supported by affidavits and documents which reflect the matters set out above. Father Putman countered with an affidavit by a former Catholic priest, who stated that it was his opinion that Bishop Vath's actions against Father Putman did not meet the requirements of natural equity, ". . . because it failed to implement three basic ingredients of due process — (a) Putman had no opportunity to appear with counsel before any Vatican official. (b) Putman had no opportunity to present evidence to any Vatican Official orally. (c) There was no opportunity of confrontation or cross-examination of adverse witnesses."
The trial court granted the Bishop's motion for summary judgment and Father Putman appealed.
The facts in this matter leave no question in our minds that the dispute between Father Putman and Bishop Vath is an ecclesiastical one. Such disputes cannot be resolved in the courts of this state. Harris v. *Page 28 Cosby, 173 Ala. 81, 55 So. 231 (1911); Mt. Olive PrimitiveBaptist Church v. Patrick, 252 Ala. 672, 42 So.2d 617 (1949).
The latter case involved a factional dispute within the church which resulted in two members being ousted from membership without notice. One of them was deposed from any official connection in the church and filed suit seeking reinstatement to the church office he had held. This court held that the civil courts would not intervene in the dispute, noting:
 "We think the court would be treading on most dangerous ground and invading a sanctuary not set apart for its jurisdiction if it should permit dissident minorities, believing themselves to have been improperly excluded because of the procedure by which they were exscinded, to invoke its power to determine such a factional dispute. . . ." 252 Ala. at 674, 42 So.2d at 619.
Likewise, in Hundley v. Collins, 131 Ala. 234, 32 So. 575
(1901), this court affirmed the trial court in its refusal to entertain a suit whereby the plaintiff sought reinstatement to the Christian Church of Huntsville, from which the General Assembly of the church had suspended him without notice and a hearing. There, the court said:
 ". . . Admitting . . . that petitioner had no notice of this proceeding, and that it was irregular according to common usage, the church being independent, and not subject to higher powers, and being a law unto itself for its own procedure in religious matters, what it did towards the expulsion of petitioner was not unlawful, even if it was not politic and wise. If the civil courts may in this instance interfere to question the exclusion of petitioner, they may do so, in any instance where a member of that or any other church is removed, on the allegation of irregular and unfair proceedings for the purpose. This would open a door to untold evils in the administration of church affairs, not consistent with the principles of religious freedom as recognized in this country, where there is no established church or religion, where every man is entitled to hold and express with freedom his own religious views and convictions, and where the separation of State and Church is so deeply entrenched in our constitutions and laws." 131 Ala. at 243, 32 So. at 578.
These expressions are consistent with the position which this court has historically taken in such matters. That position is restated in Odoms v. Woodall, 246 Ala. 427, 429, 20 So.2d 849,851 (1945):
 "The civil courts will not take jurisdiction of a controversy arising out of the removal of a minister if the right to the position is merely spiritual or ecclesiastical. But if he has a civil or property right in his position, the civil courts will protect that right. But if there is such right in the minister, which will give the courts jurisdiction, it is well settled that his removal by the appropriate church tribunal is conclusive upon the courts, if there is no violation of contractual right. . . ."
The Supreme Court of the United States has likewise avoided adjudication of religious controversies. This attitude was initially verbalized in Watson v. Jones, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1871). Attempting to define the proper scope of review of decisions made by religious tribunals, the court held:
 ". . . we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." 80 U.S. at 727, 20 L.Ed. 666.
On occasion, the United States Supreme Court has averted to the possibility of "marginal civil court review" as an exception to the Watson rule. Presbyterian *Page 29 Church in the United States v. Mary Elizabeth Blue HullMemorial Presbyterian Church, 393 U.S. 440, 89 S.Ct. 601,21 L.Ed.2d 658 (1969). In Gonzalez v. Archbishop, 280 U.S. 1, 16,50 S.Ct. 5, 7, 74 L.Ed. 131 (1929), the majority concluded:
 ". . . Because the appointment [to the chaplaincy] is a canonical act it is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them. In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise. . ."
However, the most recent decision of that court, SerbianEastern Orthodox Diocese, etc. v. Milivojevich, 426 U.S. 696,96 S.Ct. 2372, 49 L.Ed.2d 151 (1976), criticized the concept of "marginal review" as mere dictum and concluded that that concept has never developed into a concrete exception to theWatson rule, saying:
 "Thus, although Watson had left civil courts no role to play in reviewing ecclesiastical decisions during the course of resolving church property disputes, Gonzalez first adverted to the possibility of `marginal civil court review,' Presbyterian Church v. Hull Church, supra, 393 U.S. at 447, 89 S.Ct. at 605, in cases challenging decisions of ecclesiastical tribunals as products of `fraud, collusion, or arbitrariness.' However, since there was `not even a suggestion that [the Archbishop] exercised his authority [in making the chaplaincy decision] arbitrarily,' 280 U.S. at 18, 50 S.Ct. at 8, the suggested `fraud, collusion, or arbitrariness' exception to the Watson rule was dictum only. And although references to the suggested exceptions appear in opinions in cases decided since the Watson
rule has been held to be mandated by the First Amendment, no decision of this Court has given concrete content to or applied the `exception.' . . ." 96 S.Ct. at 2381, 2382.
This statement was directed to a decision of the Supreme Court of Illinois which had relied on Gonzalez to reject a decision of a religious tribunal as arbitrary. In reversing the court said:
 "The fallacy fatal to the judgment of the Illinois Supreme Court is that it rests upon an impermissible rejection of the decisions of the highest ecclesiastical tribunals of this hierarchical church upon the issues in dispute, and impermissibly substitutes its own inquiry into church polity and resolutions based thereon of those disputes. Consistently with the First and Fourteenth Amendments `[c]ivil courts do not inquire whether the relevant [hierarchical] church governing body has power under religious law . . . [to decide such disputes]. . . . Such a determination . . . frequently necessitates the interpretation of ambiguous religious law and usage. To permit civil courts to probe deeply enough into the allocation of power within a [hierarchical] church so as to decide . . . religious law . . . [governing church polity] . . . would violate the First Amendment in much the same manner as civil determination of religious doctrine.' Md. and Va. Churches v. Sharpsburg Church, 396 U.S. 367, 369, 90 S.Ct. 499, 500, 24 L.Ed.2d 582 (1970) (concurring opinion). For where resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them. Ibid." 96 S.Ct. at 2380.
 "The conclusion of the Illinois Supreme Court that the decisions of the Mother Church were `arbitrary' was grounded upon an inquiry that persuaded the Illinois Supreme Court that the Mother Church had not followed its own laws and procedures in arriving at those decisions. *Page 30 
We have concluded that whether or not there is room for `marginal civil court review' under the narrow rubrics of `fraud' or `collusion' when church tribunals act in bad faith for secular purposes, no `arbitrariness' exception — in the sense of an inquiry whether the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations — is consistent with the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom or law. For civil courts to analyze whether the ecclesiastical actions of a church judicatory are in that sense `arbitrary' must inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly require the church adjudicatory to follow, or else into the substantive criteria by which they are supposedly to decide the ecclesiastical question. But this is exactly the inquiry that the First Amendment prohibits; recognition of such an exception would undermine the general rule that religious controversies are not the proper subject of civil court inquiry, and that a civil court must accept the ecclesiastical decisions of church tribunals as it finds them. Watson itself requires our conclusion in its rejection of the analogous argument that ecclesiastical decisions of the highest church judicatories need only be accepted if the subject matter of the dispute is within their `jurisdiction.' " 96 S.Ct. at 2382.
Commenting on the ecclesiastical proceedings, the majority held:
 "Indeed, it is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith whether or not rational or measurable by objective criteria. Constitutional concepts of due process, involving secular notions of `fundamental fairness' or impermissible objectives, are therefore hardly relevant to such matters of ecclesiastical cognizance." 96 S.Ct. at 2383
In an explanatory note, the court gave reason for the conclusion:
 "Civil judges obviously do not have the competence of ecclesiastical tribunals in applying the `law' that governs ecclesiastical disputes, Watson cogently remarked . . .
 "`Nor do we see that justice would be likely to be promoted by submitting those decisions to review in the ordinary judicial tribunals. . . . It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men are in reference to their own. It would therefore be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so.'" 96 S.Ct. at 2383.
This case is not materially different from Milivojevich, except that Father Putman's position is somewhat weaker than was Milivojevich's. We conclude that the trial court properly granted the motion for summary judgment.
AFFIRMED.
MADDOX, FAULKNER and BEATTY, JJ., and CATES, Presiding Judge of the Court of Criminal Appeals, sitting by designation of the Chief Justice, concur.