

**FILED**

Dec 11 2019, 5:47 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

| | |
|---|---|
| APPELLANTS PRO SE | ATTORNEY FOR APPELLEES |
| McNeal Stewart<br>Elkhart, Indiana | Patricia A. Mastagh<br>South Bend, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| McNeal Stewart, Michael A. Carpenter, and Sheneen Haley,[1]<br><br>*Appellants-Defendants,*<br><br>v.<br><br>Stan R. McCray and Canaan Baptist Church of Elkhart, Indiana, Inc.,<br><br>*Appellees-Plaintiffs.* | December 11, 2019<br><br>Court of Appeals Case No. 19A-PL-149<br><br>Appeal from the Elkhart Superior Court<br><br>The Honorable Stephen R. Bowers, Judge<br><br>Trial Court Cause No. 20D02-1804-PL-65 |

**Friedlander, Senior Judge.**

---

[1] Although, under Indiana Appellate Rule 17, Michael A. Carpenter, an unpaid associate minister of Canaan Baptist Church, and Sheneen Haley, a member of the congregation, are considered parties on appeal, Carpenter does not participate in this appeal, and Haley was dismissed from the action at the trial court level. *See* Ind. Appellate Rule 17(A) (providing that "A party of record in the trial court . . . shall be a party on appeal.").

[1] This matter stems from a years-long dispute between certain members of the congregation of the Canaan Baptist Church, in Elkhart, Indiana (the "Church"), and its pastor, Reverend McNeal Stewart, III ("Rev. Stewart"), involving allegations that Rev. Stewart usurped the authority of the Church's board of directors and disregarded the constitution and bylaws of the Church. The parties to the dispute participated in two separate actions that were filed in the Elkhart Superior Court in July 2016 (Cause No. 20D02-1607-CT-149), and in April 2018 (Cause No. 20D02-1804-PL-65). The first action involved a battle for control of the Church's finances and property as well as an attempt to terminate Rev. Stewart from his position as pastor of the Church. The instant appeal, however, is from the second action, at the conclusion of which the trial court determined that Rev. Stewart was in contempt of court and ordered him to serve a thirty-day sentence in the Elkhart County Jail.

[2] Rev. Stewart appeals, presenting several issues for our review, one of which we find dispositive, that is, whether the trial court had subject matter jurisdiction over the second action. Concluding that the trial court lacked subject matter jurisdiction over the matter, we reverse and remand with instructions.

[3] We present the facts of this case. By way of background, and to aid the reader in understanding the dispute within the Church, we begin with a brief description of the Church and then set forth in some detail the Church's governance, according to its constitution and bylaws.

[4] The Church is a Missionary Baptist Church that is incorporated as an Indiana not-for-profit corporation. The Church follows a congregational mode of governance, i.e., "a form of Protestant church government in which each local church acts as an independent, self-governing body[.]" DICTIONARY.COM, https://www.dictionary.com/browse/ congregational?s=t (last visited on Oct. 22, 2019). The Church has adopted, and loosely adheres to, a constitution and bylaws (hereinafter, "Bylaws"). The preamble to the Bylaws states that "[w]e, the Members of Canaan Baptist Church of Elkhart, Indiana, Inc. recognizing that the Bible is the absolute standard of spirituality, morality, ethics, and the guiding rule of law, order, and faith for all members, do hereby adopt the following Constitution and Bylaws." Appellant's App. Vol. 3, p. 102.

[5] Article III of the Bylaws sets forth the Church's articles of faith, stating in relevant part that "[t]his Christian Organization accepts the Scriptures of the Old and New Testaments as the inspired Word of God. This record of God's revealed actions in human history is the authoritative basis for this Church's doctrine and practice." *Id.* at 104. Article 3.13, "A Gospel Church," provides that the Church is a "Gospel Church" and that the congregants believe that

> [A] church of Jesus Christ is a congregation of baptized believers, associated by covenant in the faith and fellowship of the Gospel; observing the ordinances of Christ; governed by His law; and exercising the gifts, rights, and privileges invested in them by His Word; that its only scriptural officers are bishops or pastors, and deacons whose qualifications, claims and duties are defined in the Epistles to Timothy and Titus.

*Id.* at 106-07. Under Article 3.16, "Civil Government," the congregants believe that

> civil government is of divine appointment, for the best interest and good order of human society; and that magistrates are to be prayed for, conscientiously honored and obeyed; except only in things opposed to the will of our Lord Jesus Christ, who is the only Lord of the conscience, and the Prince of the Kings of the earth.

*Id.* at 107.

[6]     Article V addresses conflict resolution, providing that

> [i]t is the responsibility of the Pastor and the Deacon Board to handle all issues pertaining to church discipline. They shall handle all such matters and dispense due disciplinary measures. *These are to be based on and in line with the New Testament teachings and principles as implied in the Doctrinal Statement of the Church regarding church discipline found in Matthew 18:15-22 and Galatians 6:1-5.*

*Id.* at 109 (emphasis added). Article VI sets forth Church discipline. Specifically, Article 6.1 states:

> The Objective of Discipline- The objective and purpose of discipline is to prevent, correct, restrain, or remove the evil that may exist. *To encourage and protect the right, and cherish the good for the edifying of the body of Christ, that it may be perfect in love, and without reproach.* It is not to gratify personal prejudice or secure any selfish ends. *It is to reclaim the wandering, guide the wayward, and secure the best spiritual interest of each member and the purity, good order, and efficiency of the entire body.*

*Id.* (emphasis added).  Regarding admonishment, the article provides:

> 1.  You have firsthand knowledge of sin in the body of Christ
>> (a)  If you let it go:  He may not be saved (James 5:16-20)
>>
>> (b)  He continues to live in sin (I John 1:6)
>
> 2.  Deal with it!
>> (a)  Reprove him privately (Matthew 18:16)
>>
>> (b)  He continues- Reprove him with 2 or 3 witnesses (Deuteronomy 19:15; Matthew 18:16)
>>
>> (c)  He continues- Reprove him before the Church (Matthew 18:17, I Timothy 5:20)

*Id.*  Matters of Church membership are found in Article VII.  Article 7.3, "Rights of Members," provides in relevant part:  "The church is a self-governed body aided by the Holy Spirit, Holy Scripture and Pastoral Leadership."  *Id.* at 111.

[7]  Article VIII of the Bylaws sets forth the officers of the Church and states that there are only two "scriptural offices" within the Church—the pastor and the deacon.  *Id.* at 112.  The article, however, provides for additional offices in the Church, including the Board of Trustees.

[8]  Article 8.4 provides that the pastor is "responsible for providing spiritual and administrative leadership; to this end he serves as a preacher, teacher, servant and steward, and must be uncompromising in preaching the gospel."  *Id.* at 113.  Articles 8.6 and 8.7 address the removal of the pastor, specifically:

The process for removing the Pastor, up to and not including the final vote by the members in good standing is outlined in the Church Personnel Manual.[2] *The Pastor may be subject to removal for the following reasons:*

> A. *Failure to adhere to the Word of God, Articles of Faith, Baptist Doctrine, Spiritual and Moral standards as set forth in this document.*
>
> B. *Inability and/or lack of desire to perform the duties of the Pastor.*
>
> C. *Promotion of discord or lack of harmony within the congregation thereby reducing the effectiveness of the Pastor's ministry and the church's mission.*
>
> D. *Revers [sic] to sin and worldly practices.*

8.7 SPECIAL MEETING- A special meeting to retain or terminate the employment of the Pastor is called by a simple majority of the deacon board after all efforts to resolve the issues that triggered the removal process as detailed in the Church Personnel Manual is exhausted. The [P]astor does not have the authority to cancel or moderate this meeting. The Chairman of the Deacon Board or a deacon designated by the board may moderate this meeting. This meeting will be advertised in the Church Bulletin for at least two (2) consecutive Sundays.

To carry a vote to retain the Pastor or terminate his employment requires 51% of the members in good standing for a quorum, and 51% of those present to carry a vote.

*Id.* at 114 (emphasis added).

---

[2] The Church Personnel Manual was not included in the record.

[9] Under Article 8.10, the Deacon Board, which according to the Bylaws is comprised of no more than twelve deacons, is charged with "assist[ing] the Pastor in carrying out the spiritual and administrative duties in order to better meet the needs of the [C]hurch." *Id.* at 116. Deacons may be removed from service for:

- Absence without good cause from services of the church for three (3) consecutive months or more.
- Promotion of discord or lack of harmony with the teachings of the Bible, Articles of Faith and spiritual and moral standard of the church.
- Reverting to sin and worldly practices.

    The Pastor and the Deacon Board will meet and define the specific violation committed by the Deacon charged before any contact concerning behavior of the Deacon by the church is made.

*Id.* at 117. Article 8.11 addresses the Trustee Board, providing that the "Trustee Board oversees the physical properties, financial assets and act [sic] as a bonded legal agent given its authority to act on behalf of the [C]hurch after consultation with the Pastor and Deacon Board." *Id.* at 118. Trustees may be relieved of service for the same transgressions as those set forth for deacons.

[10] Article 8.17 provides that the Board of Directors for the Church "shall consist of the Pastor and selected members of the Deacon Board and the Trustee Board." *Id.* at 122. Any appointed deacon is eligible to serve on the Board of Directors of the Church. The Pastor serves as the chairman of the Board of Directors. The treasurer/financial secretary for the Church serves as the

Treasurer of the Board of Directors, and the Clerk of the Church serves as the Board's Secretary. Two members from the congregation also serve on the Board. The Board of Directors is charged with managing the business and affairs of the Church, specifically:

> (a) Establishing and maintaining written programs and policies;
>
> (b) Overseeing operations;
>
> (c) Managing and reviewing budget and finance;
>
> (d) Complying with laws and regulations;
>
> (e) Adopting and amending the organization's articles of incorporation and constitution and bylaws;
>
> (f) Managing constituency relations;
>
> (g) Managing personnel (volunteer and paid);
>
> (h) Conducting performance evaluations of staff and of the board itself and
>
> (i) Managing funding and fund raising.

*Id.* at 124.

[11] According to Article X of the Bylaws, two types of Church meetings may be held, to which all of its congregants are welcome: 1) regular Church business meetings (defined as a regularly scheduled meeting to discuss Church business); and 2) special meetings (defined as a meeting to consider matters of a significant nature). *Id.* at 128. Church business meetings are to take place on a monthly basis. The Bylaws specify that the "moderators to conduct meetings will be selected by the [P]astor and the [D]eacon [B]oard. The agenda and how the meeting will be run will also be set by the [P]astor and the [D]eacon

[B]oard." *Id.* Regarding special meetings, notice of special meetings is to be given forty-eight hours in advance of the start time for the special meeting. The Pastor, the Deacon Board, and the Church membership all have the right to call a special meeting.

Having addressed the Church's governance, we now turn to the series of events and the complicated procedural history that gave rise to the instant appeal.

At some point during Rev. Stewart's tenure as pastor of the Church, his relationship with certain deacons deteriorated, and the congregation became fractured. The deacons at odds with the pastor were Lawrence Burns, the Deacon Board chairman, and Ron Davis, James House, Curtis Brown, and Stan McCray—all members of the Deacon Board. These deacons also constituted the majority of the Board of Directors of the Church.

The first legal action against Rev. Stewart (and other defendants) was filed in the Elkhart Superior Court in July 2016 (hereinafter referred to as "*Canaan I*") by congregants who were "various long-time members and officers of [the Church]. The majority of them [were] deacons or deaconesses of the [C]hurch, and a number of them . . . served in various other capacities, including as members of the [C]hurch's finance committee, [B]oard of [T]rustees, and choir." *Id.* at 36. The defendants in the action, in addition to Rev. Stewart, included certain "members of [the Church's B]oard of [T]rustees and [B]oard of [D]irectors, and a deacon of the [C]hurch." *Id. Canaan I* involved multiple issues, including a dispute over the ownership of the real estate upon which the

Church and the parsonage sit, as well as all the personal property associated with the Church; the removal of the Church deacons from their management of the Church's finances; the battle for control of the Church's finances; and an attempt by the deacons to terminate Rev. Stewart's employment as pastor of the Church.

[15] A hearing on the matter was held on October 3, 2017. On October 31, the trial court issued extensive and detailed findings of fact and conclusions thereon, concluding in relevant part that the Church owned the real estate and the personal property associated with the Church; the removal of certain deacons from the Deacon Board was a nullity; and the attempted termination of Rev. Stewart by certain members of the Deacon Board was of no consequence, and Rev. Stewart remained the pastor of the Church. The trial court ordered the Church to conduct an election on December 2, 2017, for the appointment of officers to manage the Church's financial accounts and other property and file a written summary of the election results with the court within seventy-two hours of the vote. Deacon Stan McCray was elected as the financial secretary for the Church at the December 2, 2017 election. By his election to the office of financial secretary, and pursuant to the Bylaws, McCray was also the treasurer for the Church.[3]

---

[3] Stan McCray was the plaintiff in the second action filed in the Elkhart Superior Court and is the appellant in the appeal before us.

On March 27, 2018, the *Canaan I* plaintiffs filed a verified emergency motion to compel compliance with the trial court's October 31, 2017 order or, in the alternative, a petition to issue a rule to show cause. The plaintiffs alleged that Rev. Stewart continued to "blatantly disregard [the trial court's October 31, 2017] Order to the extent that the very existence of [the Church] is threatened." Appellees' Amend. App. p. 104. More specifically, the plaintiffs alleged (in relevant part) the following:

> Despite requesting this Court to declare that Canaan Baptist Church had bylaws predating this lawsuit and to determine which of two sets of bylaws was in effect, the Defendants now refuse to acknowledge and follow the bylaws. The other Defendants actively support Stewart's statements and encourage the membership to follow his leadership; engage in decision making processes that contravene the bylaws; and make governing decisions that are not in compliance with the bylaws. The Defendants' disrespect and disregard is so blatant that it even extends to the Court. McNeal Stewart has made repeated comments that Canaan Baptist Church will not be governed by the bylaws or by man, including this court. These statements have been made publicly and in communication with church members.
>
> Also, in discussing the recent improperly conducted [proceeding to exclude] a Plaintiff from [Church] membership . . . , Stewart stated that he didn't care if the Plaintiff ran to [the trial court judge] because, "that white man ain't God, and he can't remove me from Canaan, and I ain't goin [sic] nowhere until my assignment is up and I'm just getting warmed up."

*Id.* at 107 (internal citations omitted). The *Canaan I* plaintiffs asked the trial court to, among other things, direct the *Canaan I* defendants to acknowledge

and comply with the Church's Bylaws, and/or show cause as to why the defendants should not be held in contempt of court.[4]

[17] Before the trial court could address the plaintiffs' March 27, 2018 emergency motion to compel, the Board of Directors for the Church voted on April 7, 2018 to impose disciplinary and corrective action ("Disciplinary Action") against Rev. Stewart and to suspend Rev. Stewart from his duties as pastor, with pay, for approximately thirty days—from April 7, 2018, through May 7, 2018.[5] The notice of Disciplinary Action that was issued to Rev. Stewart informed him that it was a "zero tolerance suspension and any violation of the terms of this suspension will result in an immediate additional and unpaid suspension of sixty (60) days duration." Appellant's App. Vol. 2 p. 65. On April 11, 2018, the vice-chairman of the Board of Directors sent a letter to Rev. Stewart, informing him that because he had violated the Disciplinary Action, his suspension was extended for an additional sixty days and that he would not receive a salary during the extended suspension period. At the time the sixty-day suspension was imposed, the trial court had yet to address the pending motions in *Canaan I*.

---

[4] Prior to the filing of the March 27, 2018 verified emergency motion to compel, the *Canaan I* plaintiffs filed a petition for rule to show cause against a member of the Board of Trustees (on November 15, 2017), a petition for rule to show cause against Rev. Stewart (on January 19, 2018), and an emergency motion for a temporary restraining order against Rev. Stewart (on January 31, 2018).

[5] A separate disciplinary action and suspension was issued against the associate minister.

[18]     On April 12, 2018, Deacon Stan McCray (and the Church) initiated a separate action in the Elkhart Superior Court (hereinafter, "*Canaan II*") against Rev. Stewart, Reverend Michael A. Carpenter (the associate minister for the Church), and Sheneen Haley (a congregant) by filing a "Verified Complaint for Temporary Restraining Order, for Temporary and Permanent Injunctive Relief, and for Damages and Attorney's Fees." *Id.* at 15-29. In their complaint, the *Canaan II* plaintiffs alleged that Rev. Stewart interfered with the function of the Board of Directors and failed to abide by the Disciplinary Action that was issued by the board. More specifically, the complaint maintained the following:

> a.  On April 8, 2018, Stewart was present at the Church premises and assumed the pulpit during worship services causing extreme disruption to the services;
>
> b.  During his time in the pulpit on April 8, 2018, Stewart waved the Disciplinary Corrective Action And Suspension in front of the congregation; told the Board of Directors that it meant nothing; that the Board of Directors could take it in front of [the trial court judge] and tell Judge Bowers that Stewart says it means nothing.
>
> c.  During his time in the pulpit on April 8, 2018, Stewart further proclaimed that he and the [associate minister] were engaged in spiritual disobedience and would not recognize the authority of the Board of Directors.
>
> d.  From and after April 8, 2018, Stewart continued to undertake the duties and responsibilities as the Pastor of [the Church].
>
> e.  On April 8, 2018, Stewart utilized social media to advocate for his position;
>
> f.  Stewart announced his intent to conduct a [C]hurch meeting on April 15, 2018, for the avowed purposed [sic]

> of taking a "vote of no confidence" and doing away with
> the Board of Directors of [the Church].

*Id.* at 19. The plaintiffs sought the trial court's enforcement of the Disciplinary Action that had been imposed on Rev. Stewart, that is, the thirty-day paid suspension and the sixty-day unpaid suspension. Rev. Stewart filed his response to the complaint on April 16, 2018.

A hearing on the matter was held on April 17, 2018. On the following day, April 18, 2018, the trial court issued its order, enforcing the thirty-day paid suspension but declining to enforce the sixty-day unpaid suspension. The Court's order also barred Rev. Stewart (and the associate minister) from entering the Church's premises until May 8, 2018. The order reads as follows:

> GRANTED, from the bench, the [*Canaan II*] Plaintiffs' request for a temporary injunction regarding enforcement of the 30-day paid suspensions of the Defendants that the church's board of directors imposed on April 7, 2018; and DENIED the Plaintiffs' request for a temporary injunction concerning the 60-day unpaid suspensions the board purported to impose for the Defendants' alleged noncompliance with the terms of the board's April 7 suspensions of the Defendants. Hence, in accordance with the terms of the board's suspension, the Defendants are hereby suspended with pay until May 7, 2018.
>
> During the period of their suspension, they are barred from the premises of the church, from using the church van, and from conducting any business on behalf of the church. They may resume their responsibilities to the church on May 8, 2018 and reenter the church premises on that date. Further, this order does not bar the Defendants from the church parsonage or the rental property where [the associate minister] resides.

> *Finally, the Court stresses that if the Plaintiffs' objective is to remove Reverend Stewart, the appropriate mechanism by which to do so is a properly noticed and conducted congregational meeting. No Court can or should attempt to run a church or interfere in matters of faith. The scope of a civil court's involvement in church governance must be limited. But the Court reminds the parties to act in accordance with the requirements of due process and the governing documents adopted by the church.*

*Id.* at 102-03 (internal footnotes omitted and emphasis added).

[20] Shortly after the trial court issued its April 18 order, the *Canaan II* plaintiffs called a special meeting to take place at the Church on May 5, 2018, at 4:00 p.m., to determine whether Rev. Stewart's employment as pastor of the Church should be terminated. On April 26, 2018, Rev. Stewart filed with the trial court in *Canaan II* a verified motion for preliminary injunction, seeking

> a preliminary injunction:
>
> (a)  Declaring null and void the Notice of Special Meeting for May 5, 2018[;]
>
> (b)  Restraining the Plaintiffs from conducting a Special Meeting to conduct a congregational vote on whether to terminate Rev. Stewart until such time as Rev. Stewart and [the associate minister] can attend the meeting;
>
> (c)  Requiring the parties to finalize [the Church's] current membership list;
>
> (d)  Requiring the right to vote of all individuals appearing on the current membership list be [sic] recognized at any Special Meeting subsequently called for the purposes of conducting a vote on whether to terminate Rev. Stewart;

> (e) Permitting counsel for the parties to attend any Special Meeting called for the purpose of conducting a vote on whether to retain or terminate Rev. Stewart; and
>
> (g) [sic] Awarding all other relief as this Court deems just.

*Id.* at 108-09. The *Canaan II* plaintiffs filed their response on April 27, 2018.

[21] On May 4, 2018, the trial court held a hearing, and that same day issued an order making an exception to the temporary restraining order (granted by its April 18, 2018 order) and permitting Rev. Stewart to attend the May 5, 2018 special meeting. The order reads in relevant part as follows:

> This cause came on for hearing May 4, 2018. The Court met with counsel for the parties. After hearing the arguments of counsel, the Court orders that Rev. McNeal Stewart and Rev. Michael Carpenter[, the associate minister,] may be present for the congregational meeting scheduled for May 5, 2018 at 4:00 pm. Rev. Stewart and Rev. Carpenter may participate in the meeting by their presence, by exercising their right to speak (5 minutes for Rev. Stewart and 2 min[utes] for Rev. Carpenter) and by voting. This order is an exception to the Temporary Restraining Order entered by the Court on April [18], 2018.

*Id.* at 125.

[22] On May 15, 2018, the plaintiffs filed a verified petition to issue a rule to show cause as to why Rev. Stewart should not be held in indirect contempt of court for violating the trial court's May 4 order. The plaintiffs alleged the following regarding Rev. Stewart:

a.   Before beginning his five minutes of allotted speaking time [at the May 5 special meeting], Stewart stood up and read the Court's [May 4] Order aloud to the congregation.

b.   Stewart then exceeded his five minute limit presentation by over a minute, despite being told by the timekeeper that his time had expired.

c.   Stewart's son[, the associate minister,] exercised his right as a member to speak for two minutes. When the timekeeper informed him that his time had expired, Stewart demanded that his son be given additional time to complete his speech. The son continued speaking.

d.   Prior to the voting, Stewart stated to the congregation, "please come and vote, please come and vote. If you have an envelope that is a challenge be sure your name is on it and its sealed. Those votes will be counted after the count." These instructions were contrary to the process agreed to by the attorneys and the Court for the handling of challenged votes.

e.   After a member of the Board of Directors, who was participating in the voting process, announced that the results would not be announced until after the attorneys and the Court had rendered a decision on the challenged ballots (this statement was made before the votes had been counted), Stewart informed the congregation, "We did not do that for the Board of Directors vote on December 2, do it the way it was done December 2." Stewart then announced, "You will count the votes tonight, you will count the votes tonight."

f.   Stewart continued to instruct the congregation, stating, "stop it everybody, pull back. They do not want to count the votes tonight. Everybody pull back. Make sure you vote and the votes will be counted. That's what happened on December 2 and if you do anything different the judge will disqualify this. Everybody back away, everybody

back away from the desk, they are trying to disqualify this vote. Everybody back away from the ballot box."

g.     Stewart is then seen on the video that was recorded, speaking with the police officer who was present, and stating, "get the ballots and count them out."

*Id.* at 142-43.

[23]     On October 21 and 28, 2018, Rev. Stewart published a notice in the Sunday Church bulletin, calling for a vote by the membership to take place on November 4, 2018, to determine if the current Board of Directors should be retained or dissolved. On Saturday, October 27, 2018, Rev. Stewart sent an email to the Board of Directors that read:

> The recent actions of this board along with the past year of questionable conduct have precipitated my call for a vote on the dissolution of the current board of directors. I cannot continue to allow this board to endanger the well[-]being of this great gospel institution called Canaan Baptist Church. At tomorrow's church service I will make the announcement of the agenda that will govern the called church meeting, any board member who wishes to speak will be given 5 minutes as I was during my retention vote. I will present my evidence list of violations and allow for congregants to have 2 minutes to speak on the behavior of this current board first. This is an official email from the President of the Board of Directors of the Canaan Baptist Church and its rightful Pastor. I will abide by the vote of the church as I hope you will. The votes of the membership will be counted directly after the vote, you may select an individual to be at the table during the vote and the count. This will all be done in front of the congregation[;] no more back room shenanigans. Please announced [sic] that person to me by email prior to the vote that would like to sit at the table.

I pray God's mercy upon all who sincerely seek Him. All of our actions should be driving [sic] by a motion to be pleasing in His eyesight. I have the gravest of concerns for the motivations of many board members that have shown a disrespect for standards of behavior and practices for this His Church and a lack of love as a governing principle for this board.

Appellant's App. Vol. 3, p. 3.

[24] On October 30, 2018, the *Canaan II* plaintiffs filed a verified emergency motion for injunctive relief to stop the planned vote to dissolve the Board of Directors. The motion alleged that Rev. Stewart's proposed vote to dissolve the board was not valid and should not be allowed to occur. On November 2, 2018, the parties stipulated that the plaintiffs' motion for injunctive relief was granted and that the congregational vote scheduled for November 4, 2018, would not take place. The trial court memorialized the stipulation in a November 2, 2018 order.

[25] On November 5, 2018, the trial court issued an order addressing the outstanding motions that had been filed in *Canaan I*. The November 5 order also addressed the plaintiffs' May 15, 2018 verified petition to issue a rule to show cause that sought a finding of indirect contempt on the pastor's part for his alleged violation of the trial court's May 4, 2018 order. In its November 5 order, the trial court eloquently provided the following, in relevant part:

These cases pose something of a moving target for the Court. There have been numerous hearings to address numerous pleadings. Attempts by the Court to implore the parties to live out their faith and resolve their differences in peace and

brotherhood have fallen on deaf ears. This Court has no doubt that each side believes that the problem rests with the other side. Fault and responsibility are not so clearly divided in this case. The Court will address all pending motions under advisement in this Order.

*****

The Court has intentionally delayed entering an Order to address the more recently filed pleadings in the hope that the parties would resolve these issues based on the principles and findings of fact set out in the original Order of October 31, 2017. The parties apparently are unable to do so. Rev. Stewart and his faction have argued correctly that it is not proper for the Court to interject itself into matters of faith or the daily operations of the church. The Court fully agrees and so stated in the October 2017 Order. The opposing faction of the church, led by the deacons of the church, argues that Rev. Stewart has willfully ignored the Orders of this Court and has violated fundamental principles of fairness and due process. The Court agrees, in part, but hastens to add that disrespect for the role of the Court and failure to abide by the spirit of certain Court Orders, is insufficient to support a finding of indirect contempt as broad as that sought by the deacons' faction.

Rev. Stewart appears to be oblivious to the fact that his heavy-handed approach to the split in the [Church] body has significantly contributed to the unholy mess in his congregation.

*****

Contempt

. . .

The Court has previously cautioned Rev. Stewart about his meddling in the administration of the Court's Orders. This Court finds that Rev. Stewart participated in the meeting to an extent that was not permitted by the Court's Order. He unnecessarily read the Court's Order aloud to the congregation before beginning his allotted five minutes to speak. Had the Court been

present, it would have advised Rev. Stewart that the reading of the Order counted against his allotted five minutes. Excluding time spent to read the Order, Rev. Stewart went over his allotted time. While this violation may appear to be de minimis, it must be viewed in the context of Rev. Stewart's other actions, including his attempt to dictate when the ballots would be counted and his insistence that his son be allowed to violate his allotted time. More importantly, Rev. Stewart usurped the role of Deacon Lawrence Burns, the person who was properly responsible to moderate the meeting. Rev. Stewart's insistence that no white judge could tell him or his church what it could do is blatantly contemptuous of the Court. The color of the judge's skin has nothing to do with the Court's decision. Rev. Stewart should be more mindful of the color of the Judge's robe. It is disrespect for the position, not the person, which is contemptuous here. The Court notes that it has never suggested that it wanted to remove Rev. Stewart from his charge as pastor of the [Church], that being the matter solely for the church membership to determine in compliance with its own Constitution and By-laws.

*Additionally, [the Church] has formed a corporate entity with an appropriate Constitution and By-laws. While those documents may impact matters of church operation, they in no way involved the Court in matters of doctrine or faith, except as the parties have agreed by creating the corporate entity under which they operate. The sole purpose of the Court has been to bring order out of chaos by requiring the parties to follow their governing documents and established standards, such as Robert's Rules of Order in running their church meetings. As set out in much greater detail in its October 2017 Order, the Court's intervention in this fashion was warranted by Rev. Stewart's gross violation of due process in conducting the meeting at which the deacons who are parties to this action were removed from office. For example, one of the deacons, Stanley McCray, was not permitted to speak on his own behalf until after the vote was taken at a meeting Rev. Stewart ran. When Rev. Stewart was questioned about this behavior during an earlier hearing, he did not appear to recognize that his*

actions were in any way wrong. He has given little indication since that time of recognizing that being the pastor of a church does not permit him to trample on the rights of others.

*Id.* at 27-31 (internal footnote omitted and emphasis added).

[26] The trial court ultimately found Rev. Stewart to be in contempt of court, ordered him confined to the Elkhart County jail for a term of thirty days, and ordered him to pay $2,500.00 to the plaintiffs' counsel. The court withheld the imposition of the contempt commitment, however, thus providing Rev. Stewart an opportunity to purge himself of the contempt, if he

> issue[d] a formal written apology to the Court and assure[d] the Court he [would] in the future, conduct the business of [the Church] in accordance with the rule of law and the Orders of this Court, i.e.[,] comply with the requirements of the Constitution and By-Laws of the [C]hurch as they may be from time to time amended and Indiana law governing not-for-profit corporations.

*Id.* at 31. The trial court, however, enjoined Rev. Stewart to "scrupulously follow the requirements of: 1) The [Church's] Constitution and By-laws; 2) Indiana statutes governing the activities of not-for-profit corporations, invalidating without limitation the procedures for electing, removing, or replacing officers and directors; and 3) Specific Orders of this Court set out in this Order." *Id.* at 33-34.

[27] Rev. Stewart paid $2,500.00 to the plaintiffs' counsel on December 4, 2018. He filed his letter of apology with the trial court on November 9, 2018.[6] However, on November 4, 2018 (the Sunday before the trial court issued its November 5, 2018 order), a member of the congregation initiated a proceeding to form a resolution committee for the purpose of removing four seated deacons—including Deacon McCray—from their duties as deacons and as members of the Board of Directors. This was done with Rev. Stewart's knowledge but was unbeknownst to the trial court. On November 12, 2018, and again on November 15, 2018, Rev. Stewart sent emails to Deacons Stan McCray, Curtis Brown, Lawrence Burns, and Ron Davis, informing them that they had been suspended from their duties.

[28] On November 16, 2018, the plaintiffs filed with the trial court a verified petition to issue a rule to show cause and an emergency request for injunctive relief. The plaintiffs sought to block the vote to suspend the deacons from their positions and also requested from the trial court an order:

> 1.      For Rev. McNeal Stewart III to appear and show cause, if any, why he should not be held in indirect contempt of court; . . .
>
> 3.      Enforcing the Court's Order of November 5, 2018 by ordering Rev. McNeal Stewart III to be immediately

---

[6] On November 14, 2018, the trial court issued an order stating that Rev. Stewart had filed his letter of apology but that the trial court found the letter "minimally satisfies the Court's requirements for suspension of the commitment for contempt." Appellant's App. Vol. 3, p. 77.

confined to the Elkhart County Correctional Facility for a
term of thirty (30) days;

4.    Injunctive relief nullifying the suspension of the Deacons
      and prohibiting the Defendants from taking any action to
      remove the Deacons or any member of the Board of
      Directors without following the Constitution and By-laws
      of [the Church]; Indiana's Non-Profit statutes; and this
      Court's Orders;

      . . . .

*Id.* at 79-80.

[29]    A hearing on the matter was held on January 4, 2019.  The plaintiffs were
represented by counsel.  Rev. Stewart was informed of his right to counsel,
however, he chose to appear as a self-represented litigant.  At the conclusion of
the hearing, the trial court issued its order that provided in relevant part:

The issue before the Court is whether there was a violation of the
Court's Order of November 5, 2018[,] which included a finding
of contempt and sanctions against McNeal Stewart.  Those
sanctions included a 30[-]day commitment to the Elkhart County
Security Center, a $2,500 payment of attorney fees for the
opposing parties and requirements of a formal letter of apology
and the following of the requirements of the constitution and
bylaws of [the Church], the Orders of this Court and the law of
the State of Indiana as it pertains to a not for profit corporations
[sic].  Having heard the evidence[,] the Court concludes that
McNeal Stewart has violated the Order of the Court.  The Court
now orders McNeal Stewart remanded to the custody of the
sheriff to carry out the 30[-]day sentence without good time
credit.  The Court notes that the commitment pertains only to
[*Canaan II*] and not to [*Canaan I*].

*Id.* at 198.

[30] On January 8, 2019, Rev. Stewart filed his Notice of Appeal. That same day, he filed with the trial court a "Motion for Bond Pending Appeal and Stay of Order." *Id.* at 199-202. The trial court denied his motion on the following day. On January 16, 2019, Rev. Stewart filed with this Court a verified emergency motion for stay and recognizance bond pending appeal. We granted his motion on January 17, 2019, and set a recognizance bond of $100.00. The trial court then entered an order setting Rev. Stewart's bond at $100.00. Rev. Stewart posted bond on January 18, 2019, and was released from jail. Rev. Stewart now appeals.

[31] The specific issues Rev. Stewart raises on appeal, consolidated and restated, are as follows:

1.  Whether the trial court's orders issued in *Canaan II* are void ab initio because the trial court lacked subject matter jurisdiction over the *Canaan II* action;

2.  Whether the trial court abused its discretion when it found Rev. Stewart in contempt of court for violating the trial court's November 5, 2018 order and ordered him to serve thirty days in the Elkhart County jail;

3.  Whether the trial court's May 4, 2018 and April 18, 2018 orders denied Rev. Stewart due process of law "by being issued without requiring [the] plaintiffs to post a bond pursuant to Ind. Trial Rule 65(C)[;]" and

4.  Whether Rev. Stewart is entitled to a refund of the attorney fees he paid to the plaintiffs' counsel.

Appellant's Br. pp. 4-5.  Finding issue number one dispositive, we do not reach issues two and three.  We address issue four by separate order of this court.

## Subject Matter Jurisdiction

[32] We now turn to whether the trial court had subject matter jurisdiction over *Canaan II* to adjudicate the matter.  Subject matter jurisdiction concerns the power of the court to hear and to determine a general class of cases to which the proceedings before it belong.  *Santiago v. Kilmer*, 605 N.E.2d 237 (Ind. Ct. App. 1992), *trans. denied*.  "When a court lacks subject matter jurisdiction, any action it takes is void."  *Perry v. Stitzer Buick GMC, Inc.*, 637 N.E.2d 1282, 1286 (Ind. 1994).  The lack of subject matter jurisdiction can be raised at any time, and, if the parties do not question it, the trial court or Court of Appeals is required to consider the issue sua sponte.  *Albright v. Pyle*, 637 N.E.2d 1360 (Ind. Ct. App. 1994).  The issue of jurisdiction is a question of law.  *Nishikawa Standard Co. v. Van Phan*, 703 N.E.2d 1058 (Ind. Ct. App. 1998).  Thus, because we are faced with a pure question of law, our review will be de novo.  *Serletic v. Noel*, 700 N.E.2d 1159 (Ind. Ct. App. 1998).

[33] The United States Supreme Court has long held that the First Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, requires civil courts to refrain from interfering in matters of church discipline, faith, practice, and religious law.  *Watson v. Jones*, 80 U.S. 679, 20 L. Ed. 666 (1871).  Thus, civil courts are precluded from resolving disputes involving churches if "resolution of the disputes cannot be made

without extensive inquiry . . . into religious law and polity . . . ." *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709, 96 S. Ct. 2372, 2380, 49 L. Ed. 2d 151 (1976). The basic law in Indiana is that courts will not interfere with the internal affairs of a private organization unless a personal liberty or property right is jeopardized. *Lozanoski v. Sarafin*, 485 N.E.2d 669 (Ind. Ct. App. 1985), *trans. denied*. "Thus, the articles of incorporation and by-laws of a not-for-profit corporation are generally considered to be a contract between the corporation and its members and among the members themselves." *Id.* at 671.

[34] We have held that "personnel decisions are protected from civil court interference where review by the civil courts would require the courts to interpret and apply religious doctrine or ecclesiastical law." *McEnroy v. St. Meinrad Sch. of Theology*, 713 N.E.2d 334, 337 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied*, 529 U.S. 1068, 120 S. Ct. 1675, 146 L. Ed. 2d 484 (2000). Ecclesiastical matters include "a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Watson*, 80 U.S. at 733, 20 L. Ed. 666; *see also Serbian Eastern Orthodox Diocese*, 426 U.S. at 713, 96 S. Ct. at 2382, 49 L. Ed. 2d 151 (specifying ecclesiastical matters are "matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law").

[35] The United States Supreme Court, however, has instructed that the First Amendment does not prohibit courts from opening their doors to religious organizations. *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull*

*Memorial Presbyterian Church*, 393 U.S. 440, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969); *see also Konkle v. Henson*, 672 N.E.2d 450, 455 (Ind. Ct. App. 1996) (First Amendment "does not entirely prohibit courts from opening their doors to religious organizations."). Instead, a court can apply neutral principles of law to churches without violating the First Amendment. *Konkle*, 672 N.E.2d 450. The First Amendment only prohibits the court from determining underlying questions of religious doctrine and practice. *Id.* However, the application of neutral principles of law to a church defendant has occurred only in cases involving church property or in cases where a church defendant's actions could not have been religiously motivated. *See Brazauskas v. Fort Wayne–South Bend Diocese, Inc.*, 714 N.E.2d 253 (Ind. Ct. App. 1999), *trans denied*.

[36] Rev. Stewart's argument is, in essence, a challenge to the trial court's subject matter jurisdiction over the *Canaan II* action. He maintains that the trial court "exceeded its subject matter jurisdiction" when it became involved in his suspension from his Church duties and in the retention vote regarding his continued employment, thus rendering the trial court's orders in the matter void ab initio. Appellant's Br. p. 28. The plaintiffs (hereinafter referred to as "McCray") contend that the trial court's orders in *Canaan II* "were properly granted and are valid because they do not violate the church autonomy doctrine and are within the [t]rial [c]ourt's jurisdiction." Appellees' Br. p. 15. According to McCray, this matter falls within the jurisdiction of the trial court because the Church is incorporated under Indiana's not-for-profit statutes, and

the trial court's determinations did not require it to delve into matters of doctrine or faith. We disagree.

[37] In *Stewart v. Kingsley Terrace Church of Christ, Inc.,* 767 N.E.2d 542 (Ind. Ct. App. 2002), this Court held that the trial court properly dismissed the minister's wrongful termination claim for lack of subject matter jurisdiction because the trial court would have had to "engage in the impermissible scrutiny of . . . doctrinal and/or church polity issues . . . ." *Id.* at 547. We noted,

> The United States Supreme Court has long held that the First Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, requires civil courts to refrain from interfering in matters of church discipline, faith, practice, and religious law. Thus, civil courts are precluded from resolving disputes involving churches if "resolution of the disputes cannot be made without extensive inquiry . . . into religious law and polity . . . ." Accordingly, this court has held that "personnel decisions are protected from civil court interference where review by the civil courts would require the courts to interpret and apply religious doctrine or ecclesiastical law."

*Id.* at 546 (citations omitted).

[38] *Emmanuel House of Prayer Church of God in Christ, Inc. v. Hall*, 787 N.E.2d 1020 (Ind. Ct. App. 2003), as corrected (June 17, 2003), involved an action to enforce a settlement agreement between the church and a bishop. We summarized the case as follows:

> In this case, Bishop Hall's complaint for injunctive relief requires the trial court to interpret ecclesiastical doctrine. Specifically,

Bishop Hall alleges that, as Jurisdictional Bishop of Indiana, only he can appoint the lead pastor of the Church. As a result, Bishop Hall's complaint alleges that the church violated various provisions within the Official Manual with the Doctrines and Discipline of the Church of God in Christ ("the Official Manual") when it appointed Gregory Williams as lead pastor. In addition, Bishop Hall has alleged that the Church's actions have had an adverse effect on the Church's finances and property. As a result, Bishop Hall requested that the trial court temporarily, preliminarily, and permanently enjoin the Church "from preventing the orderly and proper transition of pastoral leadership," and "from interfering with the orderly and proper process of the Church of God in Christ, Inc. . . . ."

*Id.* at 1025 (internal citation omitted). We reversed the trial court's order to enforce the settlement agreement, finding that the trial court lacked subject matter jurisdiction. We held that "[b]ecause there are few matters more ecclesiastical in nature than selecting the lead pastor of a church, the trial court erred when it accepted jurisdiction over the complaint." *Id.*

[39] Here, we likewise find that the trial court erred in accepting jurisdiction over McCray's complaint. *Canaan II* was initiated by McCray because Rev. Stewart allegedly would not abide by the Disciplinary Action that the deacons imposed, specifically, the thirty- and sixty-day suspensions. Thereafter began the filing by the parties of a series of pleadings with the trial court, seeking injunctive relief to prevent one another from engaging in internal Church proceedings that might result in the removal of individuals from Church leadership. However, the substance of McCray's claim in *Canaan II* does not allege a church property dispute as that term has been employed in First Amendment cases. To the

contrary, the overarching dispute is regarding who is entitled to control over the Church—Rev. Stewart or certain deacons. As the Supreme Court explained in *Hosanna–Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188-89, 132 S. Ct. 694, 706, 181 L. Ed. 2d 650 (2012),

> Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.

[40] Regarding subject matter jurisdiction over complaints that allege a failure by a church to follow its prescribed procedures, we find the analysis in a case from a sister jurisdiction to be applicable and persuasive. In *Hundley v. Collins*, 131 Ala. 234, 32 So. 575 (1902), the petitioner, following a meeting of the congregation, was removed as a member and deacon of the Christian Church of Huntsville based on a disorderly conduct charge. The petitioner petitioned the trial court for a writ of mandamus, alleging that the church had improperly removed him as a member and deacon because he was not given notice of the meeting and the congregation had not actually voted on the charge of which he was accused. The trial court denied the petition, and the petitioner appealed. The Alabama Supreme Court affirmed the judgment denying the petition, stating:

There were no property interests involved, nothing touching what are termed the temporalities of the church, as contradistinguished from its spiritualities. The petitioner had no pecuniary interests, in any direction, involved in the proceeding, and it did not touch any of his civil rights at any point. It may be, the church proceeded irregularly according to common usage in such cases; but it is averred, that this church "is of the denomination known as 'Disciples of Christ,' of which Alexander Campbell was the original preacher, if not the founder," and that "each church is of itself independent, not subject to the control of any higher or other ecclesiastical judicature." As an ecclesiastical body, therefore, it was a law unto itself, self-governing and amenable to no court, ecclesiastical or civil, in the discharge of its religious functions. It could make and unmake its rules and regulations for the reception and exclusion of members, and in reference to other matters; and what other body religious or civil could question its right to do so? Certainly, if it violated no civil law, the arm of civil authority was short to reach it. Admitting, therefore, as we must on demurrer, that petitioner had no notice of this proceeding, and that it was irregular according to common usage, the church being independent, and not subject to higher powers, and being a law unto itself for its own procedure in religious matters, what it did towards the expulsion of petitioner was not unlawful, even if it was not politic and wise. If the civil courts may in this instance interfere to question the exclusion of petitioner, they may do so, in any instance where a member of that or any other church is removed, on the allegations of irregular and unfair proceedings for the purpose. This would open a door to untold evils in the administration of church affairs, not consistent with the principles of religious freedom as recognized in this country, where there is no established church or religion, where every man is entitled to hold and express with freedom his own religious views and convictions, and where the separation of state and church is so deeply intrenched in our constitutions and laws.

These views are in accord with the decisions of other States and of the Supreme Court of the United States.

*Hundley*, 131 Ala. at 242-43, 32 So. at 578. Accordingly, the Alabama supreme court held that the trial court had no jurisdiction over the matter, even where it was alleged that the petitioner's removal from the church was not in accordance with church procedure.

[41] The instant matter arises from Rev. Stewart's suspension from his pastoral duties for his alleged failure to act in accordance with the Church's Bylaws. Regardless of whether the parties, at times, failed to adhere to the Church's Bylaws, at bottom, this is a dispute over the Church's leadership. As such, this matter, at its core, is purely ecclesiastical and one which the trial court lacked subject matter jurisdiction to adjudicate.

[42] Based on the foregoing, we conclude that the trial court erred in finding Rev. Stewart in contempt of court and ordering him to serve thirty days in the Elkhart County jail because it did not have subject matter jurisdiction to decide *Canaan II*. Thus, we reverse, remand, and instruct the trial court to dismiss *Canaan II* (Cause No. 20D02-1804-PL-65). All orders issued by the trial court in *Canaan II* are void ab initio. By separate order of this court, and issued simultaneously with this opinion, McCray's counsel is ordered to return to Rev. Stewart the $2,500.00 that Rev. Stewart paid to counsel on December 4, 2018.

[43] The judgment of the trial court is reversed, and we remand for further proceedings consistent with this decision.

Kirsch, J., and Altice, J., concur.